Stephen G. Larson (SBN 145225)
*slarson@larsonobrienlaw.com*
Jonathan E. Phillips (SBN 233965)
*jphillips@larsonobrienlaw.com*
**LARSON O'BRIEN LLP**
555 South Flower Street, Suite 4400
Los Angeles, CA  90071
Telephone:  213.436.4888
Facsimile:   213.623.2000

Attorneys for Plaintiff
JEFFREY S. BURUM

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| JEFFREY S. BURUM<br><br>                    Plaintiff,<br><br>          v.<br><br>COUNTY OF SAN BERNARDINO;<br>MICHAEL A. RAMOS, in his individual<br>capacity; R. LEWIS COPE, in his<br>individual capacity; JAMES<br>HACKLEMAN, in his individual<br>capacity; HOLLIS "BUD" RANDLES, in<br>his individual capacity; ROBERT<br>SCHREIBER, in his individual capacity;<br>JOSIE GONZALES, in her individual<br>capacity; RUTH STRINGER, in her<br>individual capacity; ADAM ALEMAN, in<br>his individual capacity; EDMUND G.<br>BROWN, JR., in his individual capacity;<br>KAMALA D. HARRIS, in her individual<br>capacity; MELISSA MANDEL, in her<br>individual capacity; and GARY<br>SCHONS, in his individual capacity<br><br>                    Defendants. | CASE NO.  5:18-cv-00672<br><br>**COMPLAINT FOR:**<br><br>(1) **RETALIATION (42 U.S.C.<br>§ 1983);**<br>(2) **MALICIOUS PROSECUTION<br>(42 U.S.C. § 1983);**<br>(3) **FABRICATION OF<br>EVIDENCE (42 U.S.C. § 1983);**<br>(4) *MONELL* **CLAIM (42 U.S.C.<br>§ 1983);**<br>(5) **SUPERVISORIAL LIABILITY<br>(42 U.S.C. § 1983);**<br>(6) **CONSPIRACY (42 U.S.C.<br>§ 1983);**<br>(7) **MALICIOUS PROSECUTION<br>(California Law);**<br>(8) **NEGLIGENCE;**<br>(9) **INTENTIONAL INFLICTION<br>OF EMOTIONAL DISTRESS**<br><br>**DEMAND FOR JURY TRIAL** |

1.     Plaintiff Jeffrey S. Burum brings this action seeking compensatory and punitive damages against Defendants COUNTY OF SAN BERNARDINO ("County"), MICHAEL A. RAMOS, R. LEWIS COPE, JAMES HACKLEMAN, HOLLIS "BUD" RANDLES, ROBERT SCHREIBER, JOSIE GONZALES, RUTH STRINGER, ADAM ALEMAN, EDMUND G. BROWN, JR., KAMALA D. HARRIS, MELISSA MANDEL, and GARY SCHONS for violations of Mr. Burum's civil and other rights under the U.S. Constitution and under California law.

2.     Mr. Burum's claims are based on an illegal campaign of retaliation, intimidation, and harassment by the County and the State of California, via their employees.  Mr. Burum is one of the managing members of Colonies Partners, L.P.'s ("Colonies") general partner.  In that role, Mr. Burum directed Colonies' business and legal efforts, and ultimately became the public face of Colonies' high-profile legal dispute with the County and the San Bernardino County Flood Control District ("District").  When Defendants and other government officials realized that the dispute had resolved favorably for Colonies and embarrassed the County and District, Defendants targeted Mr. Burum and Colonies with an unlawful campaign of retaliation for Mr. Burum's and Colonies' exercise of their First and Fifth Amendment rights.

3.     This exercise of fundamental constitutional rights began when Colonies, under the leadership and guidance of Mr. Burum, exercised its Fifth Amendment right to receive just compensation for the uncompensated "taking" of 72 acres of its land by Defendants County and District for a regional flood control facility.  Then, in connection with the civil litigation that resulted from this taking, Colonies and Mr. Burum exercised their First Amendment free speech rights to petition the government and advocate for settlement.  As a result of these constitutionally-protected efforts, Colonies secured a $102 million civil settlement in 2006 from Defendant County and the District (the "Settlement Agreement").

Finally, following the settlement, Colonies continued to exercise its free speech rights, again under the leadership and guidance of Mr. Burum, by making political contributions to general purpose political action committees ("PACs") affiliated with pro-development politicians, including members of the San Bernardino County Board of Supervisors and others who had supported the settlement.  As Mr. Burum made clear in public statements, including to various media outlets, the goal of these PAC contributions was to support pro-development politicians who would root out the intransigent and corrupt elements of the County that had plagued the Colonies civil litigation.

4.     The Defendants' retaliatory campaign developed and manifested in several ways, but no more so than in a coordinated effort to target Colonies through an unfounded criminal investigation of its general partner's two co-managing members without justification or probable cause.  This retaliatory investigation ultimately resulted in felony charges being brought against Mr. Burum, more than six years of criminal litigation, and a ten-month criminal trial in San Bernardino Superior Court in the case entitled *People v. Biane, et al*., Case No. FSB 1102102 (the "Criminal Action").  Because the investigation's motivating and ultimate goal was to punish Colonies and its management, including Mr. Burum, and not to conduct a legitimate and fair examination of the facts, it was no surprise that the prosecution's case was marred by repeated use of fabricated evidence and perjured testimony; indeed, it was so weak that Mr. Burum did not need to call a single witness in his defense.  On August 28, 2017, the next court day after the jury deliberations began, the jury acquitted Mr. Burum on all remaining charges, with the Court having already dismissed several charges for numerous legal and/or factual deficiencies.  Mr. Burum was vindicated.

5.     This thorough repudiation of the prosecution's case, and the lengths to which prosecutors, investigators, and certain County-affiliated witnesses went to manufacture some semblance of a case against Mr. Burum, is itself evidence of the

unjustified and retaliatory motives that drove the criminal investigation from the outset. There was never any credible evidence of criminal conduct involving the Settlement Agreement or subsequent PAC contributions—just a relentless drive by the Defendants to punish Colonies and Mr. Burum for having exercised their constitutional rights, and to chill Colonies and Mr. Burum from daring to exercise their constitutional rights in the future.

6. Defendants' wanton disregard of Mr. Burum's constitutional rights violates 42 U.S.C. § 1983 and California law. As a direct and proximate result of Defendants' actions, Mr. Burum has suffered and will continue to suffer damages. For these reasons, and as set forth below, Mr. Burum is entitled to compensatory damages, punitive damages, attorneys' fees and costs, pre-judgment interest, and all other relief provided by law.

## JURISDICTION AND VENUE

7. This case arises under 42 U.S.C. § 1983 and California law. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a).

8. Pursuant to California Government Code §§ 810 et seq., Mr. Burum filed his state law claims with Defendant County and the State of California on January 31, 2018. On March 13, 2018, the State, through its Government Claims Program, rejected Mr. Burum's claim, stating that because it "involves complex issues that are beyond the scope of analysis and legal interpretation typically undertaken by the GCP," it was "being rejected so you can initiate court action." On March 23, 2018, the County returned Mr. Burum's claim "without any action having been taken on it." The County stated that it was returning the claim "because it was not presented within the time required by law." Because Mr. Burum's claims were, in fact, filed timely pursuant to California law, the County's response is appropriately interpreted as a denial of all claims. Pursuant to Government Code § 945.6, Mr. Burum is now filing these claims with this Court.

9.     Venue is proper in the Central District of California under 28 U.S.C. § 1391 (b)(1) and (2), because the majority of Defendants reside in this District and substantial acts and omissions giving rise to Mr. Burum's claims occurred in this District.

## THE PARTIES

10.     Plaintiff Jeffrey S. Burum is an individual residing in Rancho Cucamonga, California.  He is the co-managing member of the managing partner of Colonies Partners, L.P., a California limited partnership with its principal place of business in Rancho Cucamonga, California.

11.     Defendant County of San Bernardino is a municipal corporation organized and existing under the laws of the State of California.  Defendant County was at all relevant times mentioned herein responsible for its own actions and/or omissions as well as the actions and/or omissions and the policies, procedures, customs, and practices of the San Bernardino County District Attorney's Office.

12.     At all relevant times, Defendant Michael Ramos was the District Attorney of the County of San Bernardino.  In that capacity, he is the official responsible for setting and enforcing the policies, customs, and practices of the District Attorney's Office.  Defendant Ramos at all relevant times directed, supervised, authorized, and/or ratified the actions of his office's employees, agents, and officials as alleged herein.

13.     At all relevant times, Defendant R. Lewis Cope was a Deputy District Attorney for the County of San Bernardino in the District Attorney's "Public Integrity Unit" and was a supervisor in that unit.  Defendant Cope is employed by and is an agent of Defendant County and the District Attorney's Office.  Defendant Cope was one of the lead prosecutors from the District Attorney's Office assigned to prosecute Mr. Burum, and as such he directed and participated in the retaliatory criminal investigation into Colonies and Mr. Burum, including directing,

supervising, authorizing, and/or ratifying the actions of the Public Integrity Unit's other employees, agents, and officials working on the Criminal Action.

14.     At all relevant times until October 2011, Defendant James B. Hackleman was a Deputy District Attorney for the County of San Bernardino, and the lead prosecutor in the "Public Integrity Unit."  Defendant Hackleman directed and participated in the retaliatory criminal investigation into Colonies and Mr. Burum, including directing, supervising, authorizing, and/or ratifying the actions of the Public Integrity Unit's other employees, agents, and officials working on the Criminal Action.

15.     At all relevant times, Defendant Hollis "Bud" Randles was an Investigator in the San Bernardino County District Attorney's office.  Defendant Randles was a lead District Attorney investigator in the retaliatory criminal investigation into Colonies and Mr. Burum.

16.     At all relevant times, Defendant Robert Schreiber was an Investigator in the San Bernardino County District Attorney's office.  Defendant Schreiber was a lead District Attorney investigator in the retaliatory criminal investigation into Colonies and Mr. Burum.

17.     At all relevant times, Defendant Josie Gonzales was the Supervisor for the Fifth District of San Bernardino County.  Defendant Gonzales initiated and participated in the retaliatory criminal investigation into Colonies and Mr. Burum.

18.     At all relevant times until October 2010, Defendant Ruth Stringer was an attorney with the County Counsel's Office for the County of San Bernardino. Defendant Stringer participated in and encouraged the retaliatory criminal investigation into Colonies and Mr. Burum.

19.     At all relevant times until December 2006, Defendant Adam Aleman was a Field Representative and assistant to then-Supervisor Bill Postmus.  Then, until July 2008, Defendant Aleman was Assistant Assessor for the County of San Bernardino.  Thereafter, Defendant Aleman was a cooperating witness who

1  initiated and participated in the retaliatory criminal investigation into Colonies and

2  Mr. Burum.

3      20.    At all relevant times until January 2011, Defendant Edmund G.

4  Brown, Jr., was the Attorney General for the State of California.  Defendant Brown

5  at all relevant times directed, supervised, authorized, and/or ratified the actions of

6  his office's employees, agents, and officials as alleged herein.

7      21.    At all relevant times from January 2011 through January 2017,

8  Defendant Kamala D. Harris was the Attorney General for the State of California.

9  Defendant Harris at all relevant times directed, supervised, authorized, and/or

10  ratified the actions of her office's employees, agents, and officials as alleged herein.

11      22.    At all relevant times, Defendant Melissa Mandel was a Supervising

12  Deputy Attorney General for the State of California.  Defendant Mandel is

13  employed by and is an agent of the State of California and the Attorney General's

14  Office.  Defendant Mandel was one of the lead prosecutors assigned to prosecute

15  Mr. Burum, and as such she directed and participated in the retaliatory criminal

16  investigation into Colonies and Mr. Burum, including directing, supervising,

17  authorizing, and/or ratifying the actions of the Attorney General's Office's other

18  employees, agents, and officials, as well as the District Attorney investigators,

19  working on the Criminal Action.

20      23.    At all relevant times until October 2011, Defendant Gary Schons was a

21  Deputy Attorney General for the State of California.  He was employed by and was

22  an agent of the State of California and the Attorney General's Office.  Defendant

23  Schons was one of the prosecutors assigned to prosecute Mr. Burum, and as such he

24  directed and participated in the retaliatory criminal investigation into Colonies and

25  Mr. Burum, including directing, supervising, authorizing, and/or ratifying the

26  actions of the Attorney General's Office's other employees, agents, and officials, as

27  well as the District Attorney investigators, working on the Criminal Action.

28      24.    In taking the actions alleged herein, Defendants acted under color of

law, with the exception of the County's actions in connection with the Colonies civil litigation and settlement (as alleged in Paragraphs 26-44 below).

25.     As set forth below, Defendants conspired with each other and others to illegally retaliate against, intimidate, and harass Mr. Burum for directing Colonies' assertion of its First and Fifth Amendment rights and its successful resolution of its dispute with the County and District, and for his ongoing exercise of his own First Amendment Rights.

## FACTUAL ALLEGATIONS

### Civil Litigation Over the Uncompensated Taking of Colonies' Land, the Settlement, and Colonies' Post-Settlement Political Contributions

26.     The County's long campaign to deprive Mr. Burum and Colonies of their rights began in 1999 when Colonies refused to be victimized by the County and District's efforts to unlawfully take 72 acres of prime developable land, without just compensation, to build a regional flood control facility.  In 1997, Colonies purchased 434 acres of land in Upland, California for development.  When the County and other entities built the 210 freeway extension through Colonies' property, they needed a large area in which to contain the massive water runoff caused by that project and the related 20th Street Storm Drain.  The 20th Street Storm Drain was a regional flood-control facility built in Upland to provide 100-year flood protection for the below-grade portion of the 210 freeway west of Colonies' property.  The 20th Street Storm Drain ended in a 12-foot-by-14-foot concrete outlet located on the western edge of Colonies' property.  Instead of appropriately exercising their power of eminent domain over Colonies' land, or even simply offering to fund the necessarily huge flood control basin, the County and District set out to force Colonies to build the flood control facility itself, on Colonies' own land, and at its own expense.

27.     In 1999, the District's executive director, Ken Miller—knowing that water runoff from the 210 freeway project would be torrential and would require

construction of a new, vast, expensive flood control facility—attempted to trick Colonies into agreeing to hand over the land and build the basin itself.  He did so by lying about the amount of water involved and the necessary size of the flood control facility.  The truth was that existing flood control facilities were utterly inadequate to contain the up to 80 million gallons of water per hour that could be unleashed onto the property through the 20th Street Storm Drain.  Despite having no legal obligation to do so, Colonies offered to end the dispute by giving the County and District the necessary acreage so long as the County and District would pay for the construction of a basin sufficient to control the new storm waters resulting from the 210 freeway project and the 20th Street Storm Drain.  The County and District refused.

28.    Instead, the County and District, spurred by their attorneys, some of the County Supervisors, and District management, stubbornly insisted that limited easements dating from the 1930s permitted them to redirect the massive flood waters created by the freeway's construction onto Colonies' land—and that it was then Colonies' responsibility to construct and pay for the necessary regional flood control facilities.

29.    The County and District also tried to argue that they had obtained "consent" from Colonies in 1999, conveniently ignoring that the only "consent" was as to the physical and geographic placement of the 20th Street Storm Drain, and that even this limited "consent" was based on fraud and deceit.  Colonies never consented to the County or District diverting flood water onto Colonies' property without just compensation.

30.    As one of Colonies' managing partners, and Colonies' primary representative in the course of meetings and negotiations with the County, Mr. Burum saw firsthand the duplicity of County and District staff.  Far from ensuring public safety and sound government practice, County and District staff were repeatedly willing to jeopardize not only the Colonies project, but public health and

safety by failing to provide adequate infrastructure to safely collect and disperse water runoff from the newly-constructed 210 freeway. Mr. Burum vocally criticized the government for its mishandling of the Colonies project, publicly expressing his concern about County and District practices.

31. Facing an intransigent County and District, and with the 20th Street Storm Drain on the verge of being "turned on" with no facilities to contain the resultant flood waters, Colonies had no other option than to file a quiet title action in March 2002 to vindicate its property rights. That action went to trial in 2003 before San Bernardino County Superior Court Judge Peter H. Norell. Mr. Burum testified on Colonies' behalf during that trial. Colonies won the action when Judge Norell ruled that the County and District had no right to divert and dump flood water onto Colonies' property without just compensation. Undeterred, and still refusing to take responsibility for their actions, the County and District doubled down and appealed the decision, leading to a second trial on the issue three years later.

32. In the meantime, recognizing that the lack of adequate flood control facilities posed a grave threat to public safety, Colonies built a new flood control basin on its own land and at its own expense, rushing to finish it before an anticipated El Niño winter deluge in 2003-04. Shockingly, the County and District's lawyers and public safety officers at this point turned on a dime: After years of haranguing, cajoling, urging, and threatening Colonies to build the basin, they now filed a petition for writ of supersedeas to *stop* Colonies from constructing the basin—an all-too transparent effort to gain a litigation advantage in the pending appeal. Fortunately, the Court of Appeal rejected this ill-conceived gambit, recognizing that the County and District's interference posed an imminent threat to public safety.

33. The seven-year civil battle over Colonies' land ultimately came to a head in a second trial before San Bernardino County Superior Court Judge

Christopher J. Warner in 2006.  After hearing six weeks of testimony, Judge Warner released a blistering statement of intended decision on July 31, 2006, finding not only that Colonies was legally right, but also confirming that the County and District had peddled in fraud, coercion, and deceit.  Among other things, Judge Warner found that:

a) The County and District's claimed easements were insufficient to justify the necessary flood control facilities, and thus the County and District's actions constituted a "gross surcharge" that permanently extinguished any easements on Colonies' land—meaning the County and District had no right to dump *any* water onto the property;

b) The County and District had played "hide the ball," engaged in "deceit," and tried to "coerce" Colonies into giving up its land rights;

c) The County and District had held Colonies' development "hostage" in an effort to get free flood control construction and had "unreasonably and unjustifiably interfere[d] with [Colonies'] business";

d) The County and District had "turned on" the 20th Street Storm Drain in 2002 "without providing for any viable flood-control facilities on [Colonies'] property and without ensuring public safety from the flooding hazard"; and

e) Colonies had taken "every reasonable action to protect the public" even in the face of the County and District's "deceit and misinformation."

34.     Mr. Burum again testified on Colonies' behalf during this second trial before Judge Warner.  In his statement of intended decision, Judge Warner held that Mr. Burum was "a very credible witness" who "answered questions directly, succinctly, and without hesitation and equivocation."  In the eyes of County and District staff, this praise of Mr. Burum was bad enough, but it was worse when contrasted to the Court's description of County witnesses.  The Court criticized the credibility and veracity of multiple County and District staff who testified at trial,

including District directors Mr. Miller and Patrick Mead.  The Court's adoption of Mr. Burum's testimony over the testimony of these District employees added a viscerally personal angle to the County's dispute with Colonies.

35.    Judge Warner's statement of intended decision was a watershed moment in the dispute.  County attorney Mitchell Norton later told investigators that Judge Warner's opinion was "Armageddon" for the County and District.  He explained that had Judge Warner's intended decision become final, it would have paved the way for Colonies to recover upwards of $300 million in damages in an inverse condemnation action that had been stayed pending resolution of the quiet title case.  Moreover, Judge Warner's multiple findings of bad faith by the County and District would have severely threatened their attempts to obtain indemnification from the other government agencies involved in the 210 freeway expansion.

36.    Facing this dire legal position, four out of the five County Supervisors repeatedly voted in favor of settlement—yet County lawyers and officials continued to do everything possible to stop a settlement.  For example, Mr. Norton bragged that he had inserted "poison pills" into a draft settlement agreement for the purpose of sabotaging the agreement.  And Defendant Stringer refused to sign off on the legality of the settlement even though she later admitted having very little involvement with, or understanding of, the underlying civil litigation, and therefore no basis on which to decide that the proposed settlement was unlawful or even improvident.

37.    The County and District's high-priced outside attorneys—who had just lost the Colonies trial—likewise had no basis to justify their opposition to settlement.  The County and District had unwisely spent millions of dollars on law firms whose lawyers had little or no background in land disputes.  Embarrassed by their repeated defeats, these outside attorneys joined County Counsel and other County and District officials in digging their heels in, trying to scuttle the settlement, and championing further appeal and delay.

38.     In the months following Judge Warner's tentative decision, Mr. Burum repeatedly commented publicly on the County and District's intransigence, causing the County, District, and their employees further public embarrassment.  Mr. Burum openly advocated for a settlement of the dispute, and also offered sharp, public criticism of the County's Board of Supervisors and staff.  Among Mr. Burum's public statements were the following:

a) "Politics has more to do with their inability to make a settlement offer than the law.  If these were two private-sector companies, they would have settled this.  [The County and District] know that they are wrong."

b) "The [Court's tentative] ruling is a victory for private property owners all over the state and nation who have been bullied and victimized by the government."

c) "Judge Warner's ruling shows you can fight City Hall – and win."

d) "[The County] certainly had many opportunities to settle with us but they've snubbed us and the public, choosing to waste the public's money on lawyers instead.  The County's response today is just the latest example of their arrogance and abuse of power."

e) "The Board of Supervisors has recklessly spent taxpayer dollars, trampled private property rights and endangered public safety by refusing to provide flood protection."

f) "[The County engaged in] shameful behavior toward the Colonies Partners."

g) "I find [the County's] response alarming both for the taxpayers and Colonies.  As a taxpayer of San Bernardino County, I am disappointed that the actions of politicians on the Board of Supervisors are going to cost us all additional millions of dollars."

h) "This offer could hardly be considered a sign of good faith.  It's more consistent with the pattern of behavior [Judge Warner] used to describe the county – deceitful."

39.     As a result of the litigation and Mr. Burum's high-profile criticisms, the County suffered a steady stream of negative press articles and public opinion expressing concern that the County and District's incompetence and misconduct had exposed taxpayers to such massive risk.

40.     As part of the effort to informally resolve the litigation, Mr. Burum also actively and directly petitioned members of the Board of Supervisors and other County officials and employees to accept responsibility for the County and District's actions and reasonably settle the dispute.

41.     These exercises of Colonies' and Mr. Burum's First Amendment rights mirrored Colonies and Mr. Burum's strategy throughout the civil litigation.  In addition to litigating the dispute in court, Colonies actively participated in the political process, generally at Mr. Burum's urging, direction, and encouragement. On behalf of Colonies, Mr. Burum retained professionals such as former California State Senator James Brulte and media consultant Patrick O'Reilly, both of whom were integral to Colonies' direct communications with County Supervisors and its efforts to shape public discourse regarding the dispute.  These efforts publicized the role of County lawyers and staff in botching the dispute, angering these individuals and giving them additional motive for retaliatory action.

42.     Defendants' motive for retaliation was particularly acute because Colonies had been effective in exercising lawful political influence and convincing voters to upend the do-nothing status quo.  Mr. Burum was very much the architect and public face of these political efforts.  In 2002, Colonies publicly and aggressively opposed the re-election campaign of then-Supervisor Jon Mikels of the Second District—the district in which the development was located.  Mr. Burum and his co-managing partner, Dan Richards, had met with Mr. Mikels prior to filing

Colonies' lawsuit to discuss informally resolving the dispute.  Mr. Mikels rudely and vulgarly rejected Mr. Burum and Mr. Richards, declaring his absolute opposition to even negotiating a settlement.  Rejected by their own Board representative, Colonies unsurprisingly supported Mr. Mikels' opponent, Rancho Cucamonga City Councilman Paul Biane, who won the 2002 supervisorial election by a large margin.  Several individual Colonies partners, including Mr. Burum, also directly donated to Mr. Biane's campaign.  Colonies also financially supported Ontario Mayor Gary Ovitt—another staunchly pro-development politician—in his successful 2004 run for Supervisor.  Colonies' successful engagement in the political process scared and inflamed others who realized that Mr. Burum's and Colonies' vigorous public participation could be turned against them as well.  It also concerned County lawyers and staff who were concerned that newly-elected officials might not automatically defer to their self-proclaimed expertise.  So, when Colonies and Mr. Burum's persistence in court and in petitioning the government eventually succeeded, Defendants were unwilling to let Colonies and Mr. Burum's success in enforcing Colonies' rights go unanswered.

43.    On November 28, 2006, Colonies, the County, and the District settled the bitter four-year litigation and seven-year public fight over the unlawful "taking" of Colonies' land.  Facing hundreds of millions in damages and the prospect of unending attorneys' fees, the Board of Supervisors voted 3-2 to approve a $102 million settlement in exchange for Colonies releasing all of its damages claims and deeding the subject land to the District for its flood control purposes.  Supervisors William Postmus, Gary Ovitt, and Paul Biane voted in favor of the settlement; Dennis Hansberger and Defendant Gonzales voted against.  Defendant Gonzales had consistently supported settlement until the eleventh hour.  On information and belief, she changed her vote to avoid the political consequences she feared would flow from her support for a large settlement.  She also had her own large donors to appease, some of whom were competitors of Colonies and had benefited from the

distraction that protracted litigation had imposed upon Colonies.

44.     In 2007, months after the settlement vote, Colonies—under Mr. Burum's leadership—again exercised its First Amendment rights of free speech and petition by making political donations to PACs associated with members of the Board of Supervisors, and others, who had supported the settlement and who would advance pro-development policies.  Colonies and Mr. Burum hoped that these contributions would help get politicians elected who not only would support further development in the Inland Empire, but would exercise appropriate authority and oversight over the County's lawyers and staff so as to avoid future legal debacles.

## The Unlawful Investigation

45.     No sooner was the ink dry on the Settlement Agreement than upset and embarrassed elements within the County apparatus began planning their retaliation. And they were joined by new allies:  The San Bernardino District Attorney's Office and California Attorney General's Office.  Angered over the civil litigation, the Settlement Agreement, and the 2007 PAC contributions, and motivated by illegal and improper purposes, but without any credible evidence of wrongdoing, Defendants orchestrated a campaign to punish Colonies and Mr. Burum. Defendants intimidated witnesses, falsified evidence, hid exculpatory evidence, and eventually presented false testimony to two grand juries and the trial jury, all to fabricate a case against Mr. Burum, the public face of the Colonies dispute and the target of Defendants' ire.  By attacking Mr. Burum, Defendants could neutralize not only Mr. Burum individually, but Colonies as an organization.  This illegal campaign intentionally punished Colonies and Mr. Burum for exercising their constitutionally-protected rights and chilled both Colonies' and Mr. Burum's ability to petition their government or make political contributions after 2007 for fear of continuing and additional reprisals.

46.     The conspiracy to deprive Colonies and Mr. Burum of their constitutional rights was also politically expedient.  In 2010, Defendants Ramos

and Brown held a joint press conference to announce the prosecution of what they called the largest public corruption scandal in the history of California.  Both were facing upcoming elections.  Defendant Brown claimed that it was the "most appalling corruption case in decades" and "a shocking example of how money can corrupt the government process"—statements made, as though proven facts, even as Defendant Brown was collecting record amounts of campaign cash for his own race for California Governor.  Defendant Ramos noted that two Colonies partners had been named as unindicted co-conspirators at the time, and warned that there was an "ongoing investigation."  Defendant Ramos then decried, again stated as though a proven fact, "a well-orchestrated political and personal attack on this District Attorney, attempting to intimidate me in obstructing justice and finishing this job."  Defendant Ramos, recognizing that Colonies and Mr. Burum were threats to his power, declared that he was going to "finish the job" by aggressively investigating Colonies and Mr. Burum.

47.    Leaving no doubt that this was a joint campaign between the San Bernardino County District Attorney's Office and the California Attorney General's Office, Defendant Ramos assured the public that Defendant Brown was his "crime-fighting partner," and that both were responsible for the investigation.  Defendant Ramos explained that the Attorney General's Office "went through all of our evidence, and now have worked with us every day on this."  Defendant Ramos expressly named Defendants Hackleman, Schons, and Mandel, and explained that they were "working together every day" on the investigation.

48.    Defendants Brown and Ramos both made it clear that their real targets in the criminal investigation were Colonies and Mr. Burum.  Defendant Ramos lamented that Colonies had obtained compensation for its property in "these tough economic times," and explained that his goal was to "get that money back to the citizens," a statement he repeated innumerable times at various political and fund-raising events throughout Mr. Burum's prosecution.  Defendant Ramos further

claimed that these "well-funded folks, developers" were somehow trying to "attack and control the D.A.'s office for exposing this corruption."  The truth was the precise opposite:  Defendant Ramos was on the attack, using the media and the power of his office to advance the orchestrated campaign of retaliation against Colonies and Mr. Burum.

49.     Defendant Brown demonstrated similar animus against Colonies and Mr. Burum, stating that he found it significant that there was "$102 million being voted on," and explaining that the settlement would be "void" and the $102 million would be paid back to the County by Colonies.  He also claimed as fact that there was "no basis" for the $102 million settlement, a position readily disproven by a host of witnesses and contemporary documentation.  But Defendant Brown, like the other Defendants that participated in the retaliation campaign, had no interest in the actual facts of the case, or a fair investigation.

50.     After Defendant Harris took office as Attorney General, she issued a press release taking credit for the indictments as "the result of a combined effort by Attorney General Kamala D. Harris and San Bernardino County District Attorney Michael A. Ramos."  The Attorney General's Office explained that the "two agencies jointly investigated the case and presented it to the grand jury."  Moreover, the press release revealed that the case was "part of a continuing probe by both the Attorney General and the DA into corruption in San Bernardino County." Attempting to use the indictments for political gain and to turn the public against Colonies, Defendant Harris claimed that her office was sending "a strong message that we will never tolerate this sort of abuse of public trust."  In just one early demonstration of the Orwellian nature of Defendants' invented case, the press release claimed that the criminal defendants "used political action committees to conceal the bribes."  And yet, all of the PAC contributions at issue had been *disclosed* on public records in the normal course of required reporting under the Political Reform Act.

51.     Later, Defendant Harris confirmed to local media outlets that Defendant Schons, Defendant Mandel, and Deputy Attorney General Emily Hanks would continue to "assist" County prosecutors in the Colonies case at Defendant Harris's direction, while confirming that she was "committed to doing everything" she could to support the ongoing investigation.

52.     In 2011, Defendant Ramos held yet another press conference after Mr. Burum, Mark Kirk, James Erwin, and Mr. Biane were indicted and arrested. During that press conference, Defendant Ramos quoted Defendant Mandel as calling the prosecution team "Team Justice," a pretext in the ongoing battle to win public support for the retaliation scheme.  Defendant Ramos identified "Team Justice" as including Defendant Cope, Defendant Randles, Defendant Schreiber, Defendant Hackleman, Deputy District Attorney Michael Smith, Deputy District Attorney John Goritz, Defendants Schons, Mandel, Brown, and Harris, and others. Defendant Ramos claimed that the team "worked hard" together and uncovered a "significant amount of evidence."  He claimed that "Team Justice" had gathered dozens of witnesses.  He claimed that Mr. Postmus's guilty plea supported what "Team Justice . . . already knew":  The Colonies defendants were guilty.  Defendant Ramos's conduct in this matter demonstrates that when he exclaimed that "corruption would not be tolerated in San Bernardino County," what he really meant was that "Colonies and Mr. Burum would not be tolerated in San Bernardino County."

53.     During this 2011 press conference, Defendant Ramos again brought up the $102 million settlement payment, and explained that "Team Justice" was going to seek an order of restitution requiring Mr. Burum and Colonies to return the settlement payment—even though the District had already received 72 acres of Colonies' developable land for regional flood control use.  Defendants, angry that the District had been forced to compensate Colonies for that land, used the pretext of the prosecution to pressure Mr. Burum and Colonies to disgorge Colonies' hard-

won compensation guaranteed under the Fifth Amendment.  Indeed, Defendant Ramos explained during the press conference that the District Attorney's Office was also "partners" with the San Bernardino County Counsel's office in their efforts to recover the $102 million, leaving no doubt about the County's and Defendant Ramos's complicity in their joint retaliation scheme.

54.     Defendant Schons also spoke at the press conference on behalf of the California Attorney General's Office.  Defendant Schons emphasized the "equal partnership" shared between the District Attorney's Office and the Attorney General's Office in investigating and prosecuting the case.

55.     For his part, Defendant Ramos recognized that the investigation was the ideal opportunity to not only retaliate against and politically neutralize Mr. Burum and Colonies, but to make his vendetta the centerpiece of his supposedly "anti-corruption" reelection campaigns.  At one point, Defendant Ramos's agents described political contributions against him by Mr. Burum's and Colonies' supporters as "felony stupid"—an unsubtle threat that those supporting Defendant Ramos's opponents would suffer from similar retributive action.  Defendants Mandel, Cope, Randles, and Schreiber, as well as numerous other County officials, likewise used the unlawful and retaliatory investigation to advance their careers.

56.     Mr. Burum's public advocacy for Colonies particularly inflamed Defendants, and Mr. Burum thus became the specific target of their ire.  As a harsh and vocal critic of the County and District, Mr. Burum raised public awareness and brought attention to the incompetence and intransigence of County and District officials, who could have ended the Colonies dispute at just a fraction of the cost in time and expense to all parties.  His effective testimony in the trial before Judge Warner sealed the County and District's litigation doom, exposing not only the County and District's fraud and deceit, but also unmasking the County and District *as the actual threat to public safety* in connection with the Colonies project.  In light of these revelations, Defendants and others were desperate to change the

19

message by attacking the messenger.  On information and belief, Defendants also knew that Mr. Burum was the driving force behind hundreds of thousands of dollars in campaign contributions, a clear and present threat to any candidate—such as Defendant Ramos—who regularly had to face voters in a re-election campaign. Defendants were aware from public filings and the usual political rumor mills that Mr. Burum and Colonies had already opposed one of their number—Defendant Gonzales—in previous elections, and feared for their own political futures.

57.     The pretext for the retaliatory investigation against Colonies and Mr. Burum was an allegation that the 2007 PAC contributions were "secret" payoffs for the three votes that approved the Colonies settlement.  Of course, there was no credible evidence that bribery had taken place, and not even any evidence that the campaign contributions were "secret"—all of them were fully disclosed.  On information and belief, because prosecutors and investigators—including Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons—pursued the investigation for reasons having nothing to do with actual guilt, they ignored or buried all the significant exculpatory evidence they uncovered.

58.     Defendants' retaliatory investigation was not about pursuing justice, or any search for truth.  By advancing flimsy charges, ignoring or hiding exculpatory evidence, misleading grand juries, and intimidating and manipulating witnesses, Defendants knew they could deter Colonies and Mr. Burum from further exercises of First and Fifth Amendment rights.  Defendants knew that Colonies and Mr. Burum would be severely limited in participating in future elections.  This was important to Defendants, particularly given Defendant Ramos's periodic reelection campaigns.  Keeping Defendant Ramos in office was a necessary part of the retaliation scheme, as Defendant Ramos was willing to abuse the power of his office to pursue Defendants' common goal of punishing and deterring Colonies and Mr. Burum.

59.    On information and belief, because Defendants' motivation was retribution and revenge against Colonies and Mr. Burum, rather than justice, Defendants ignored that the 2006 settlement legitimately and reasonably ended four years of contentious civil litigation.  They ignored that the County was facing legal defeat following Judge Warner's July 2006 tentative ruling in the underlying civil case.  And they ignored that the County avoided financial annihilation by settling a $300 million claim for $102 million—a conclusion the County and County-retained counsel and expert witnesses had already recognized and were affirmatively arguing in the County's ongoing insurance indemnity litigation.

60.    Investigators and prosecutors—including Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons—also disregarded other evidence of the Settlement Agreement's legality.  For example, in 2007 the San Bernardino County Superior Court conclusively held that the Settlement Agreement was legal and valid following a validation action supported by a unanimous Board of Supervisors and *brought by the County*—a holding subsequently upheld by the Court of Appeal in dismissing a 2012 lawsuit brought by taxpayer groups seeking to challenge and invalidate the settlement (the "Taxpayer Action").  Defendants also ignored evidence from Deputy County Counsel Norton that the 2006 settlement was objectively reasonable given the County's risk at the time.

61.    Investigators and prosecutors—including Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons—also failed to adequately investigate all reasonable leads and evidence in the course of investigating Mr. Burum.  They did not even bother to interview any Colonies-related witnesses, including Colonies' legal counsel in the civil litigation with the County, nor did they interview any of the judges who presided over the two Colonies civil trials or the mediator who helped the parties negotiate the Settlement Agreement.

62.    Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons also failed to adequately investigate the veracity of material accusations made by Defendant Aleman during his interviews and testimony.  For example, when Defendant Aleman claimed that he had seen political "hit pieces" on Mr. Erwin's computer, Defendants failed to seize the computer and thus never conducted forensic analysis that would have disproved this claim.  Defendant Aleman appeared at one meeting with Defendants Randles and Schreiber carrying a 200-page Power-Point presentation.  While this presentation was discussed during the interview, Defendants Randles and Schreiber claimed they did not retain a copy of the PowerPoint, and thus it was never produced to Mr. Burum.  Perhaps most egregiously, Defendant Aleman falsely claimed that he had attended several meetings with Mr. Burum and Mr. Postmus at the Red Hill Country Club's clubhouse in 2006 in which Mr. Burum supposedly offered bribes to Mr. Postmus.  Defendants failed to conduct even a basic investigation into these claims, which would have quickly revealed that the clubhouse had been torn down in late 2005 and the new clubhouse was not opened until 2007—meaning these supposed meetings could not have occurred.

63.    This strategy of failing to adequately investigate any leads that might uncover exculpatory evidence manifested itself in the investigation again and again. For example, Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons also failed to adequately investigate the veracity of Defendant Gonzales's false claim that Mr. Burum had pressured her during a trip to China shortly before the Settlement Agreement was finalized.  At one point, Defendant Gonzales's Chief of Staff, Bob Page, brought various email communications with him for an interview with Defendant Randles.  One particular email contradicted Defendant Gonzales's claims regarding this supposed pressure, and yet Defendant Randles did not even bother to collect the email, much less follow up on it as part of the investigation.  Defendants also failed to review Mr.

Burum's American Express bills, which had been obtained by subpoena, to determine if Mr. Burum had even been in China at the time Defendant Gonzales claimed he pressured her.  Even a cursory review of these bills would have shown that Mr. Burum was actually in the Palm Springs, California area attending a wedding during this time.  Of course, Defendants also could have confirmed that Mr. Burum was not in China by simply reviewing his passport, which had also been seized and which proved that he had not traveled to China during this time.  But apparently they did not bother to take even this simple step to check the veracity of Defendant Gonzales's claims.  In fact, Defendant Randles admitted under oath at trial that he did *no* investigation to determine whether Defendant Gonzales's fantastic claims about Mr. Burum were true.  Defendants preferred to have Defendant Gonzales testify untruthfully so as to advance their retaliatory agenda— and thus they avoided any investigation that would have disproven her claims.

64.     Investigators and prosecutors—including Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons—not only ignored this and other exculpatory evidence, they withheld all manner of exculpatory evidence from the grand jury for the purpose of obtaining an indictment against Mr. Burum, which they knew would require a vast commitment of Mr. Burum and Colonies' time and resources to defend.

65.     Moreover, Defendants Hackleman and Stringer agreed in 2010 to pursue a dishonest "two paths" strategy, documented in written correspondence discovered during the criminal prosecution.  These documents demonstrate that the County agreed to defend the legality of the settlement in its civil indemnity litigation, while prosecutors would simultaneously try to prove its criminality as part of Mr. Burum's prosecution.  On information and belief, they reasoned that by pursuing both paths, at least one of them would succeed in punishing Colonies and Mr. Burum.  Defendant Stringer even violated her ethical duties in her zeal to punish Colonies and Mr. Burum by sharing attorney-client privileged information

1    with Defendant Hackleman *before* the Board of Supervisors voted to waive the

2    privilege.

3        66.    Prosecutors and investigators did not stop at ignoring or burying

4    exculpatory evidence.  Members of the prosecution team—including Defendants

5    Randles and Schreiber—affirmatively fabricated evidence to prop up their case.

6    And, on information and belief, they were supervised in doing so by Defendants

7    Ramos, Cope, Hackleman, Brown, Harris, Mandel, and/or Schons.

8        67.    Most egregiously, they coerced Mr. Postmus into giving false

9    testimony and leveraged his drug addiction to manipulate his memory.  Mr.

10   Postmus was one of the Supervisors who voted in favor of the Settlement

11   Agreement.  He was also affiliated with one of the PACs that received political

12   contributions from Colonies in 2007.  Investigators needed someone to tie these

13   two events together to build their case of bribery against Mr. Burum—and

14   Defendants Randles and Schreiber, on information and belief supervised by

15   Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and/or Schons,

16   targeted Mr. Postmus as someone they could manipulate because of his ongoing

17   and longstanding methamphetamine addiction and the numerous felony charges he

18   faced based on his drug use and illegal conduct in the Assessor's Office.

19       68.    Mr. Postmus had left the Board of Supervisors after being elected to

20   the position of County Assessor in January 2007.  As he has since admitted, he was

21   battling severe drug addiction at that time, and the impact of that drug use soon

22   became apparent, especially to trained law enforcement officials.  By January 2011,

23   Mr. Postmus had been forced to resign as Assessor and was facing numerous felony

24   charges for actions unrelated to Colonies or Mr. Burum.  He was even arrested in

25   court for making an appearance under the influence of methamphetamine.

26       69.    On information and belief, Defendants Randles and Schreiber knew all

27   of this because of their involvement in the criminal investigation and case against

28   Mr. Postmus.  And because they knew full well how methamphetamine abuse

impacts memory—among other things, making someone more susceptible to having false memories implanted by coercive questioning—they recognized and seized the opportunity to manipulate Mr. Postmus into becoming their star witness for their campaign of retaliation and retribution against Colonies and Mr. Burum. In fact, they went so far as to avoid drug testing Mr. Postmus, giving Defendants Cope and Mandel plausible deniability when they eventually elicited false testimony from Mr. Postmus before the indicting grand jury in which he claimed to have been sober for months (only to later admit that he had been using methamphetamine throughout his cooperation with the District Attorney's Office and his grand jury testimony).  Of course, failing to drug test Mr. Postmus had the added benefit to Defendants Randles and Schreiber of increasing the likelihood that Mr. Postmus would continue his methamphetamine abuse and thus remain in the drug-addled state they needed to continue manipulating him.

70.    Defendants' strategy worked.  Over the course of five interviews in early 2011, Defendants Randles and Schreiber repeatedly and successfully manipulated Mr. Postmus's memory and coerced him into saying what they wanted to hear.

71.    Most critically, investigators and prosecutors—including Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Harris, Mandel, and Schons—refused to accept Mr. Postmus's repeated denials of a corrupt *quid pro quo* agreement to exchange his vote for the 2007 campaign contributions.  In his initial interviews with Defendants Randles and Schreiber, Mr. Postmus explicitly and repeatedly denied that he had ever accepted a bribe in exchange for his pro-settlement vote.  And he emphatically stated that Mr. Burum had "never crossed the line" with him in dealing with the Colonies matter.  On information and belief, Defendants refused to accept this truth because it did not further their retribution campaign against Colonies and Mr. Burum.  So, over the course of several interviews, Defendants Randles and Schreiber—on information and belief,

supervised by Defendants Ramos, Cope, Hackleman, Harris, Mandel, and/or Schons—convinced Mr. Postmus that he had committed various felony offenses related to the settlement, and coerced him into pleading guilty and testifying to those supposed offenses before the indicting grand jury.

72.     Defendants Randles and Schreiber also planted smaller deceptions for the purpose of manipulating Mr. Postmus into telling larger lies.  For example, they convinced Mr. Postmus during their interviews that he had fired the County's outside counsel in 2004 at Mr. Burum's insistence.  But they knew that could not be true, as Mr. Postmus had already told them he did not get to know Mr. Burum until a trip to China over a year later.  Indeed, it eventually became part of the prosecution's narrative to claim that Mr. Burum had arranged to go on the 2005 China trip for the precise purpose of meeting and "grooming" Mr. Postmus.  Of course, even that premise was easily disproven by an objective investigation, which would have found that Mr. Postmus had been invited to go on that China trip a year earlier for reasons entirely unrelated to Mr. Burum.  Mr. Postmus later recognized and admitted that his contradictory and nonsensical "memories" of these events had been planted by an unscrupulous and coercive prosecution team.

73.     Defendants Randles and Schreiber—on information and belief, supervised by Defendants Ramos, Cope, Hackleman, Brown, Mandel, and/or Schons—reinforced their manipulation of Mr. Postmus by using his purported friend, Defendant Aleman, to secretly record conversations in which he tried to trick Mr. Postmus into confirming the false allegations of bribery.  But even this exercise soon became mired in fraud and cover-up.  Defendants Randles and Schreiber became aware soon after their first meeting with Defendant Aleman that in his eagerness to join the conspiracy, he had already secretly taped a conversation with Mr. Postmus.  This was a violation of California law, as Defendant Aleman had not yet been authorized to record any conversations as an agent of the state.  Of course, Defendant Aleman already had enough legal trouble, so Defendants

Randles and Schreiber went into full cover-up mode. They both filed after-the-fact reports claiming to have given Defendant Aleman timely permission to record Mr. Postmus. But they failed to coordinate their stories, and their separate reports told contradictory accounts of when and how Defendant Aleman was first authorized to secretly record Mr. Postmus.

74. Defendants Randles and Schreiber—on information and belief, supervised by Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and/or Schons—also threatened and intimidated other witnesses, including Matt Brown, in attempts to obtain false testimony. Mr. Brown was Mr. Biane's Chief of Staff at the time of the Colonies settlement and subsequent PAC contributions. Defendants intimidated Mr. Brown into wearing a wire and making secret recordings of his conversations with Mr. Biane, Mr. Postmus, and others. Although Mr. Brown recorded dozens of conversations with men who knew and trusted him in 2009 and 2010, none of these recordings revealed the slightest evidence of corruption or bribery. To the contrary, Mr. Brown recorded Mr. Postmus stating that there was no bribe. Of course, this notable absence of evidence did not deter Defendants in the slightest. Defendants Cope and Mandel—on information and belief, supervised by Defendants Ramos and Harris—simply hid the exculpatory lack of evidence from the grand jury, and later, the trial jury. In fact, not only did prosecutors fail to introduce a single one of these recorded conversations into evidence during the trial, they aggressively opposed Mr. Burum's defense team's efforts to play them for the jury, or even inform the jury that none of the recordings contained any inculpatory evidence.

75. As for the District Attorney investigators, they continued pursuing the aggressive and illegal tactics that had justifiably earned them the nickname of the "Thug Squad." During one interview, Defendant Randles exclaimed that he and the "Public Integrity Unit" were "elephant hunters . . . out for big game," leaving no doubt that his big game targets were Colonies and Mr. Burum. Instead of using

legitimate interview techniques, these investigators bullied witnesses, put words in witnesses' mouths, and engaged in a scorched-earth mission to bring down Colonies no matter the cost.  One such witness, Dino DeFazio, recently had trumped-up perjury charges against him dismissed after they had been pending for eight years.  Mr. DeFazio's lone fault was telling the grand jury the truth, which was not what the "Thug Squad" wanted to hear.

76.     Defendant Randles's vendetta against Colonies and Mr. Burum was further motivated by his discovery that Colonies and Mr. Burum had worked with Mr. Erwin when exercising their First Amendment rights to petition the Board of Supervisors to approve the Settlement Agreement.  Defendant Randles held a grudge against Mr. Erwin, as illustrated by a statement he made in 2008 that Mr. Erwin was in line to become Chief of Staff to a San Bernardino County Supervisor "unless somebody can stop him."  Defendant Randles's vendettas against Colonies, Mr. Burum, and Mr. Erwin escalated when he discovered that they were working together.  On information and belief, the mere fact of their association further inflamed his desire for revenge.  Despite (or perhaps because of) these obvious biases, Mr. Randles was named as "lead investigator" for the Colonies investigation and remained the lead investigator throughout the entire retaliation campaign.

77.     As evidenced by the above and other conduct, the entire structure of the "Public Integrity Unit," led by Defendants Cope and Hackleman and overseen and supervised by Defendant Ramos, directly led to the unlawful and unjustified violation of Colonies' and Mr. Burum's constitutional rights.  The District Attorney investigators and prosecutors were part of a single organizational unit with no true separation between the investigation and prosecution.  Defendants Cope and Hackleman were directly involved in the botched and corrupt investigation, rather than remaining sufficiently separate to ensure its integrity and ultimately make independent charging decisions.  This commingling of roles led to investigators and prosecutors failing to verify or corroborate false information obtained from Mr.

Postmus, Defendant Aleman, Defendant Gonzales, and others.  Prosecutors, investigators, and County witnesses with an axe to grind reinforced each other's passions and prejudices, feeding false information and unsubstantiated allegations into a self-deluding "echo chamber" through which the Defendants' prejudices against Colonies could take voice.

78.    The result was that Defendants Randles and Schreiber elicited and even fabricated false information, Defendants Cope, Hackleman, Mandel, and Schons—on information and belief, supervised by Defendants Ramos, Brown, and Harris—pushed the investigation to its predetermined outcome, and no one bothered to augment their zeal for retribution with even a shred of concern for truth and justice.  Instead, investigators and prosecutors—including Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons— pursued a wrongful investigation and, ultimately, felony charges against Mr. Burum, despite ample evidence that they were meritless.

## Other Conspirators in the Unlawful Retaliation

79.    Other current and former County employees instigated and championed the bogus investigation.  On information and belief, at least two— Defendants Gonzales and Aleman—conspired with the other Defendants to retaliate against Colonies and Mr. Burum for exercising their constitutional rights.  Among other things, Defendants Gonzales and Aleman helped initiate the wrongful investigation and the eventual prosecution of Mr. Burum by providing false statements to District Attorney investigators, and then agreed to repeat those false statements in perjurious testimony before the grand juries and criminal trial jury.

80.    On information and belief, Defendant Gonzales helped initiate the investigation by making a false report in late 2006 or early 2007 to the District Attorney's Office, apparently claiming that the Settlement Agreement was procured by corruption.  Of course, Defendant Gonzales had no actual evidence of corruption to report; rather, on information and belief, she was motivated to avoid political

fallout from the size of the settlement and to appease some of her largest financial

backers who were rival land developers of Colonies and Mr. Burum.

81.     Beginning in 2008, Defendant Gonzales volunteered other false

information to District Attorney investigators and the grand jury, including that Mr.

Burum had supposedly intimidated her in the run-up to the 2006 settlement.  For

example, Defendant Gonzales falsely claimed that Mr. Burum menaced her in

China prior to the settlement, to the point that she feared he was going to kidnap,

drug, and take compromising photographs of her.  Supposedly the purpose of all

this was to intimidate or extort her into voting for the Settlement Agreement.  This

was fantasy:  Defendant Gonzales and Mr. Burum were never in China at the same

time, a fact known by prosecutors who nonetheless elicited this false testimony

before the grand jury and during Mr. Burum's trial.

82.     On information and belief, Defendant Gonzales entered into an

agreement with one or more of the other Defendants to make false statements and

provide perjurious testimony as part of the conspiracy to retaliate against Colonies

and Mr. Burum for having exercised their First and Fifth Amendment rights.

Defendant Gonzales was motivated to conspire with other Defendants and make

these false statements by her desire to punish Colonies and Mr. Burum for

vindicating their First and Fifth Amendment rights to approach the government and

seek fair compensation in the civil litigation with the County and District, for

successfully petitioning the government in connection with the Settlement

Agreement, and for making political contributions to PACs associated with

Defendant Gonzales's political rivals.  She was further upset by Mr. Burum's

public advocacy for Colonies' interests and his highly personal criticisms of her,

the Board of Supervisors, and County staff.

83.     Defendant Aleman also conspired with one or more of the other

Defendants to initiate the wrongful investigation and prosecution.  Beginning in

2008, Defendant Aleman started supplying investigators and prosecutors with

knowingly false information to initiate and encourage the criminal investigation against Mr. Burum.  At the time, Defendant Aleman himself was under investigation for various criminal conduct in the County Assessor's Office.  As Defendant Aleman has since admitted, he had lied about Mr. Postmus's drug use and sexuality, used campaign accounts as his own personal slush fund, physically destroyed County equipment to cover up his and Mr. Postmus's misdeeds, altered public documents sought by the civil grand jury in their investigation of the Assessor's Office, and lied under oath to that grand jury.

84.   Seeking to obtain a favorable plea deal, Defendant Aleman claimed he had information about other criminal conduct in the County.  Under questioning by Defendants Randles and Schreiber, Defendant Aleman at first truthfully reported that he had very little information about the Colonies settlement and knew nothing of any crimes in that context.  But when it became clear that investigators were willing to ignore Defendant Aleman's wrongdoing in return for his cooperation in the retaliation scheme, Defendant Aleman began to exaggerate his role in the settlement negotiations and to fabricate claims of bribery and corruption.  He did this because he knew investigators and prosecutors were focused on punishing Colonies and Mr. Burum for the Settlement Agreement and PAC contributions, and joining the conspiracy against Colonies and Mr. Burum was the best way to avoid consequences for his own illegal actions.

85.   At the invitation of Defendants Randles and Schreiber—on information and belief, supervised by Defendants Ramos, Cope, Hackleman, Brown, Mandel, and/or Schons—Defendant Aleman began "developing" evidence against Mr. Postmus and Mr. Burum.  In text messages and secretly recorded conversations, Defendant Aleman began feeding Mr. Postmus the false narrative that Mr. Burum had bribed Mr. Postmus.  Defendant Aleman knew more than anyone else how drug-addled and vulnerable Mr. Postmus was, and how susceptible his memory was to accepting this confabulation as the truth.  Defendant

31

Aleman also began to tell investigators he had firsthand information that Colonies and Mr. Burum made the 2007 PAC contributions in a *quid pro quo* exchange for Mr. Postmus's vote. For example, Defendant Aleman invented meetings between Mr. Postmus and Mr. Burum in 2006 during which the corrupt agreement was supposedly struck and at which Defendant Aleman claimed to be present. The meetings were entirely imaginary. Defendant Aleman even placed some of these meetings at the Red Hill Country Club's clubhouse at a time when it did not exist (having been demolished to make way for a new clubhouse), a fact that was readily discoverable had Defendants bothered to engage in objective investigation instead of blindly pursuing their efforts to retaliate against Colonies and Mr. Burum. Despite these obvious lies, prosecutors advocated in Defendant Aleman's subsequent sentencing hearing that he had told the truth, and urged leniency for his crimes. Thus, just as he had hoped, Defendants Ramos, Cope, Mandel, and others ultimately allowed Defendant Aleman to walk away with little more than a slap on the wrist in appreciation for cooperating with the scheme.

86. On information and belief, Defendant Aleman entered into an agreement with one or more of the other Defendants to make these false statements and provide perjurious testimony as part of a conspiracy to retaliate against Colonies and Mr. Burum for having exercised their First and Fifth Amendment rights.

87. Another member of the conspiracy to illegally retaliate against Colonies and Mr. Burum was Defendant Stringer, the San Bernardino County Counsel at the time of the Settlement Agreement and throughout much of the criminal investigation. In 2010 (if not earlier), Defendant Stringer began cooperating and conspiring with Defendant Hackleman and the District Attorney's Office in the retaliation campaign. Among other things, Defendant Stringer:

a) Met with prosecutors regarding their suggestion to "move towards the filing of a GC1092 [Government Code § 1092] action to recover the $102M";

b) Voluntarily met with prosecutors at least a dozen times in 2010 to assist with their investigation and prosecution of Mr. Burum;

c) Voluntarily provided feedback to prosecutors on the felony complaint attacking the Settlement Agreement and its legality;

d) Signed a voluntary waiver of the attorney-client privilege and the mediation privilege on behalf of the County as to "any request by the prosecutors to produce or examine any documents maintained by the County" or to interview witnesses;

e) Provided attorney-client privileged information to investigators even before the attorney-client privilege was waived by the County; and

f) Voluntarily met with prosecutors at least an additional two dozen times in 2011, prior to Mr. Burum's indictment, to assist them in developing the false narrative that the Settlement Agreement was unreasonable and illegal.

88.     Defendant Hackleman expressly told Defendant Stringer that it was the District Attorney's goal to "be prepared to show that [the settlement] was unreasonable" even though the County was simultaneously defending the reasonableness of the settlement in its indemnity litigation in court and in its insurance arbitrations.  Defendant Hackleman went on to explain that having the District Attorney follow a diametrically different path than the County was "an epic challenge."  Nevertheless, on information and belief, Defendant Stringer entered into an agreement with one or more of the other Defendants to continue providing assistance in pursuing the illegal Colonies investigation as part of the conspiracy to retaliate against Colonies and Mr. Burum for having exercised their First and Fifth Amendment rights.

1

## **Presentation of False Testimony and Evidence**

2       89.    Defendants Cope and Mandel—on information and belief, supervised

3 by Defendants Ramos, Brown, and/or Harris—presented fraudulent evidence to

4 grand juries in both 2009 and 2011 to secure Mr. Burum's indictment on false

5 charges and without probable cause.  Among other things, they presented Mr.

6 Postmus's, Defendant Aleman's, and Defendant Gonzales's false testimony

7 discussed above.  They also pressured other witnesses, including Mr. Brown, to

8 give false testimony.  And Defendant Randles testified falsely about the timing of

9 his investigation in order to prevent certain charges from being barred due to the

10 statute of limitations.

11       90.    Defendants Cope and Mandel—on information and belief, supervised

12 by Defendants Ramos and/or Harris—also manipulated the grand jury process to

13 hide exculpatory evidence.  For example, they presented evidence that Judge

14 Warner and others had been the subject of a judicial ethics investigation due to

15 alleged inappropriate contacts with Mr. Burum, knowing that the instigator of that

16 investigation—James Lindley—had recanted his allegations.  Mr. Lindley was a

17 County employee who had claimed in 2006 that he had information that one of the

18 judges for the civil case (either Judge Norell or Judge Warner) was golfing buddies

19 with Mr. Burum—with the clear implication being that this improper relationship

20 impacted the case.  Defendants Cope and Mandel presented this accusation to the

21 indicting grand jury through testimony from former County Counsel Dennis

22 Wagner, without informing the grand jury at that time that Mr. Lindley had

23 recanted his claim.  Then, in what they admitted was a highly unusual move, they

24 called Mr. Lindley to testify in front of a separate civil grand jury at the same time

25 that the criminal grand jury was sitting.  During his testimony, Mr. Lindley

26 candidly admitted that he had no basis for the damaging accusation and had

27 presented it to his superiors to inflate his reputation.  But because the prosecution

28 manipulated the grand jury process, the indicting grand jury did not get to hear Mr.

Lindley's rueful recantation.  Instead, Defendants Cope and Mandel waited until the very end of the grand jury process to present a secondhand, sanitized version of Mr. Lindley's admissions.  This allowed them to present the rumor to the grand jury as further "evidence" of corruption, while hiding for as long as possible the fact that Mr. Lindley's account was wholly fictitious, and depriving the grand jury of the opportunity to evaluate Mr. Lindley's credibility or ask him any questions of their own.  This strategy paid off, as grand jurors openly wondered—without any basis in reality—whether "Judge Warner was in Jeff Burum's pocket financially or otherwise."

91.    Defendants Cope and Mandel—on information and belief, supervised by Defendants Ramos and/or Harris—also presented other "evidence" to the grand jury that unfairly impugned the reputation of retired California Supreme Court Justice Edward Panelli, who had served as mediator in the Colonies civil case. They introduced testimony from Defendant Gonzales claiming that she saw Mr. Burum talking to Justice Panelli after a mediation session and supposedly giving him a ride in Mr. Burum's car, and that she knew that this encounter was "extremely wrong" and perhaps "extremely illegal."  Defendants Cope and Mandel also asked a witness hypothetically—without presenting any evidence—if he would have had concerns if Justice Panelli had accepted a plane ride from Mr. Burum. They elicited this testimony despite having no basis to believe that Justice Panelli had engaged in any impropriety.  Indeed, as a mediator, Justice Panelli had no decision-making authority over the civil case, so this "evidence" had no relevance to the bribery allegations.

92.    On information and belief, Defendants Cope and Mandel—supervised by Defendants Ramos and/or Harris—introduced these allegations regarding Judge Warner, Judge Norell, and Justice Panelli in order to create an aura of corruption over the entire civil case, to hint at additional acts of uncharged and unproven crimes by Mr. Burum and others, and to cast doubt over the reasonable—and

legal—basis for the Settlement Agreement.  In this manner, they implied and ultimately argued, without evidence, that the only possible reason for the Settlement Agreement was bribery and corruption.

93.    As a result of the Defendants' fraud, perjury, threats, lies, and sham investigation, the 2011 grand jury indicted Mr. Burum on seven felony charges.

94.    The criminal trial that eventually followed only served to further expose that the Colonies investigation had not been a legitimate attempt to uncover the truth, but instead a retaliation campaign.  The following are only some of the examples of testimony and evidence elicited by the prosecution at trial that backfired, exposing the fraudulent and retaliatory nature of the Colonies investigation:

a) Defendant Randles again claimed, as he had before the indicting grand jury, that prior to his November 1, 2008 interview of Defendant Aleman, he did not know who Mr. Burum was, a highly material allegation relevant to the delayed discovery exception rule to the statute of limitations.  On cross-examination, Defendant Randles's own words exposed his claim as a lie.  Indeed, tapes of Defendant Randles discussing Mr. Burum in earlier 2008 interviews were played in the courtroom.

b) Defendant Gonzales told the trial jury that Mr. Burum was lurking in China in 2005 for the purpose of taking advantage of her and intimidating her into voting for the Settlement Agreement.  On cross-examination, it was proven that Defendant Gonzales was not in China in 2005—she was at various well-publicized events in San Bernardino and Louisiana. Defendant Gonzales then changed her story, under oath, and claimed it was in 2006 that she saw Mr. Burum in China.  But Mr. Burum was not in China during that 2006 trip.  He was in Palm Springs at the wedding of his business partner's daughter.  When confronted with Mr. Burum's passport, which established that Mr. Burum did not go to China in 2006,

1   Defendant Gonzales stubbornly refused to admit her lies, instead claiming

2   that he could have flown into Communist China on a private jet and

3   evaded customs.  Defendant Gonzales also testified that she had a long

4   record of voting against the Colonies settlement, which was entirely

5   contradicted by her actual voting record of voting in favor of settlement at

6   every opportunity until the very end.  At no point during several days of

7   this contradictory, fabricated, and outlandish testimony did prosecutors

8   attempt to prevent or correct this perjury from their own witness; instead,

9   they continued to elicit it and doubled down in redirect examination.

10   c)   Defendant Aleman testified on direct examination that Mr. Postmus only

11   became involved in the Colonies litigation after a trip to China in

12   September 2005 that both Mr. Postmus and Mr. Burum attended.  This

13   was false, as Defendant Aleman conceded under cross-examination.

14   Defendant Aleman also claimed that he attended several meetings at the

15   Red Hill Country Club clubhouse in 2006 in which Mr. Postmus and Mr.

16   Burum supposedly discussed the alleged bribe.  But the evidence showed

17   that there was no Red Hill Country Club clubhouse in that period; it had

18   been torn down and was being rebuilt—a fact anyone could have

19   discovered with little investigation.  Defendant Aleman lied about the

20   locations of other supposed meetings as well, with cross-examination

21   exposing that he had told different stories at different times.

22   d)   Defendant Mandel also helped Defendant Aleman cover up his illegal

23   receipt of campaign funds.  When initially asked about having obtained

24   personal reimbursement for a political event, Defendant Aleman denied

25   having ever done so.  Defense counsel then confronted Defendant Aleman

26   with public records evidencing that he received an unlawful personal

27   reimbursement for campaign expenditures.  Defense counsel eventually

28   forced Defendant Aleman to admit that he had lied about receiving these

37

funds.  Nevertheless, on redirect examination, Defendant Mandel
attempted to rehabilitate Defendant Aleman's credibility.  She elicited
further perjurious testimony from Defendant Aleman that he had not
unlawfully received campaign funds, which was contradicted by the
documentary evidence she—and everyone in the courtroom—had just
viewed.  Defendant Mandel also asked questions designed to whitewash
Defendant Aleman's embezzlement and dishonesty by eliciting testimony
that reimbursement from campaign funds was routine and legal—although
they were nothing of the sort in this instance.  In doing so, Defendant
Mandel tried to hide Defendant Aleman's theft, hide his lies about the
theft, and knowingly suborned perjury.

e) Defendants Randles and Schreiber became aware soon after first meeting
with Defendant Aleman that he had secretly taped a conversation with Mr.
Postmus, a violation of California law because he had not yet been
authorized to record as an agent of the state.  Defendant Aleman admitted
that he lied on the stand when he initially claimed he had authority to
make the recordings.  But Defendant Randles nevertheless insisted that
Defendant Aleman had been authorized.  On cross-examination, it was
shown that Defendants Randles and Schreiber had conspired to provide
Defendant Aleman with a cover story—but they failed to coordinate their
stories, filing separate police reports with entirely different accounts of
when and how Defendant Aleman was first authorized to secretly record
Mr. Postmus.

f) Mr. Postmus falsely testified on direct examination that he had been
bribed by Mr. Burum.  Defendants Cope and Mandel—on information
and belief, supervised by Defendants Ramos and/or Harris—allowed this
testimony despite the fact that Mr. Postmus had repeatedly told their
investigators that there was no *quid pro quo* agreement to accept a bribe

in exchange for a pro-settlement vote, and that Mr. Burum had never "crossed the line" to obtain the Settlement Agreement.  On cross-examination, Mr. Postmus was shown how Defendants Randles and Schreiber had bullied and manipulated him into "confessing" to crimes that never occurred.  After recognizing how he had been taken advantage of, Mr. Postmus testified on cross-examination that he was "100% positive" no bribery had occurred, and reaffirmed that Mr. Burum had "never crossed the line" in advocating for the Colonies settlement.

g) Mr. Postmus also testified on direct examination that Mr. Burum had engineered Mr. Postmus's attendance on a 2005 trip to China, which prosecutors argued was an effort to "groom" him to accept bribes.  In reality, and as confirmed by documents in the prosecution's possession, Mr. Postmus had been invited by an unrelated third party a year earlier.

95.   In short, cross-examination revealed the prosecution's "evidence" to be pure farce.  Indeed, after six months of impeaching every prosecution witness on multiple points, Mr. Burum rested his defense case without calling a single witness. And it took only two days of deliberation for the jury to acquit Mr. Burum on all remaining charges on August 28, 2017, after Judge Smith had already dismissed a number of counts for either legal deficiency or failure to present evidence to support them.

96.   Interviewed after their verdict, members of Mr. Burum's jury made no secret of their outrage at the waste of taxpayer dollars and the evident incompetence and fraud they witnessed for so many months.  Indeed, they wondered—among other things—why prosecutors had presented obviously false testimony and why Defendants Randles and Gonzales were not facing prosecution for perjury.   One juror expressed that prosecutors "lacked any type of grounds to prosecute." Another juror expressed that Defendant Aleman was untrustworthy and not credible, and "never" should have been on the witness stand.  A third, wondering

1   why the trial took several months, suggested that if there had been proof of guilt,

2   the prosecution should have "shown that right away."

3       97.     The answer, of course, is that none of the Defendants had any interest

4   in pursuing justice.  The entire exercise was a pure act of retaliation against

5   Colonies and Mr. Burum for exercising their First and Fifth Amendment rights.

6   Judge Warner was absolutely correct when he stated in a September 6, 2017

7   newspaper op-ed that the criminal trial was a "travesty" which "should never have

8   occurred."  And though Colonies and Mr. Burum were finally vindicated, it was at

9   the cost of millions of dollars and irreparable damage to their public reputations.

10      98.     Sadly, but not surprisingly, Defendant Ramos has not let up even after

11  the public humiliation he suffered in the Colonies trial.  When Mr. Burum and

12  others made campaign contributions to political committees supporting Defendant

13  Ramos's current opponent in the upcoming election for District Attorney, Mr.

14  Ramos again started making threats of retribution, publicly claiming that these legal

15  and fully-disclosed political contributions constituted "money laundering."  Mr.

16  Ramos's efforts to chill First Amendment activity thus continue unabated.

## FIRST CLAIM

### Retaliation – 42 U.S.C. § 1983

### Against Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons

21      99.     Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1

22  through 98 of this Complaint as though fully set forth herein.

23      100.    Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown,

24  Harris, Mandel, and Schons, all state actors or acting under color of state law, had a

25  duty to permit Mr. Burum free exercise of his constitutional rights.

26      101.    When Mr. Burum exercised these rights, as set forth above,

27  Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel,

28  and Schons retaliated against Mr. Burum in the manner alleged herein for

participation in what Defendants knew were First and Fifth Amendment protected activities.  These Defendants' retaliatory conduct included, but is not limited to, the following:

    a)  Initiating a fraudulent and illegitimate criminal investigation into Colonies and its management, in particular, Mr. Burum;

    b)  Publicly threatening to use the criminal investigation as a means to take back the $102 million Colonies had received as just compensation for the County and District's taking of its land;

    c)  Manipulating and coercing Mr. Postmus into falsely claiming that his vote in favor of the Settlement Agreement had been corruptly influenced by Colonies and Mr. Burum;

    d)  Eliciting false statements during the investigation, and eventually perjurious testimony, from Defendants Gonzales, Aleman, and others, in particular regarding Mr. Burum's actions prior to the Colonies settlement;

    e)  Threatening and attempting to coerce other witnesses, such as Matt Brown, into making false statements during the investigation and providing perjurious testimony;

    f)  Fabricating and falsifying evidence during the investigation; and

    g)  Hiding exculpatory evidence from two grand juries.

102.   Mr. Burum's exercise of his constitutional rights, as set forth above, was a substantial and/or motivating factor in Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons's wrongful retaliatory conduct.

103.   Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons's actions against Mr. Burum would chill a person of ordinary firmness from continuing to exercise their constitutional rights;

104.   The harm to Mr. Burum from Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons's illegal actions includes

lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

105.   Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons's conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

## SECOND CLAIM

### Malicious Prosecution – 42 U.S.C. § 1983

### Against Defendants Cope, Randles, and Schreiber

106.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 105 of this Complaint as though fully set forth herein.

107.   As alleged herein, the investigation of Mr. Burum was not undertaken to obtain evidence of a crime, but instead to harass and retaliate against Colonies and Mr. Burum for exercising their First and Fifth Amendment rights and obtaining what Defendants perceived as a favorable settlement of the civil litigation.  When the District Attorney's Office learned of the settlement, it immediately began plotting to use its power and authority to retaliate against Colonies and Mr. Burum.

108.   And yet, even as late as 2017 when he was testifying under oath at trial, Defendant Randles explained "I don't know a lot about the facts" of the civil litigation.  Though he testified that he believed the Colonies settlement was egregious and outrageous, he had no factual basis for this belief.  He never read any of the documents underlying the civil litigation.  He read none of the judge's opinions.  He never read, much less understood, the appraisal that valued Colonies' land taken by the County at over $100 million.  He never bothered to interview many Colonies-related witnesses, instead relying almost solely on the biased complaints of County witnesses.

109.   Defendants Randles and Schreiber were the lead "investigators" in this

retaliatory campaign against Colonies and Mr. Burum.  But rather than conducting a thorough and open-minded investigation, it was one-sided, biased, and conducted with the preordained goal of convicting Mr. Burum.  Defendant Cope likewise participated in and oversaw the unjust investigation, including bullying Mr. Postmus during investigative interviews into making false statements.  As alleged above, Defendants Randles and Schreiber also threatened and bullied witnesses, ignored exculpatory evidence that did not serve their purpose of retaliating against Colonies and Mr. Burum, intentionally failed to obtain and/or preserve exculpatory evidence, fabricated evidence, and, in the case of Defendant Randles, even testified falsely under oath before the grand jury and trial jury.

110.   Moreover, and as alleged above, this improper investigation was carried out by the Public Integrity Unit, in which prosecutors participated in the investigation and the roles of prosecutors and investigators were comingled. Because of their comingled roles, and because prosecutors, including Defendant Cope, had participated in the biased investigation, prosecutors did not exercise independent judgment when prosecuting Mr. Burum.

111.   In the alternative, on information and belief, Defendants Randles and Schreiber knowingly withheld information from prosecutors in order to secure an indictment against Mr. Burum, including concealing the date on which their investigation began, concealing Defendant Aleman's misconduct, and withholding the extent of Mr. Postmus's drug use and hence his unreliability as a witness, and fabricating evidence, as alleged above.  Defendants Randles and Schreiber thus both withheld relevant information from prosecutors, and knowingly supplied false information to prosecutors.  As a result of their misconduct, prosecutors were unable to exercise independent judgment in prosecuting Mr. Burum.

112.   Defendants Randles and Schreiber also manipulated the investigation through their handling of Mr. Postmus, the prosecution's key cooperating witness. Knowing that Mr. Postmus was suffering from a long-time drug addiction,

Defendants Randles and Schreiber used interrogation techniques designed to plant memories of events that never happened.  To encourage Mr. Postmus further, Defendants Randles and Schreiber never subjected Mr. Postmus to any drug monitoring or testing during the period of Mr. Postmus's cooperation, the better to keep Mr. Postmus pliable and cooperative.

113.   Defendants Randles, Schreiber and Cope, by their actions and conduct of the investigation as alleged above, maliciously caused Mr. Burum to be prosecuted without probable cause, and they did so for the purpose of denying him his right to exercise his constitutional rights without government retaliation and to deny him the ability to exercise his constitutional rights going forward.

114.   The harm to Mr. Burum from Defendants Randles, Schreiber, and Cope's illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

115.   Defendants Randles, Schreiber, and Cope's conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of punitive damages as to each of them.

## THIRD CLAIM

### Fabrication of Evidence – 42 U.S.C. § 1983

### Against Defendants Randles and Schreiber

116.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 115 of this Complaint as though fully set forth herein.

117.   As alleged above, Defendants Randles and Schreiber fabricated evidence that was then used to criminally indict and prosecute Mr. Burum.  This included the false statements and testimony of Mr. Postmus, Defendant Aleman, and Defendant Randles himself.

118.   Additionally, as alleged above, Defendants Randles and Schreiber continued their investigation of Mr. Burum despite the fact that they knew that Mr.

Burum was innocent, or were deliberately indifferent to Mr. Burum's innocence, and the results of the investigation were then used to criminally indict and prosecute Mr. Burum.

119.   Additionally, as alleged above, Defendants Randles and Schreiber used techniques that were so coercive and abusive that they knew, or were deliberately indifferent, that those techniques would yield false information that was then used to criminally indict and prosecute Mr. Burum.  In particular, Defendants Randles and Schreiber coerced and manipulated Mr. Postmus into changing his testimony from a complete and unequivocal denial of any *quid pro quo* agreement with Mr. Burum, to instead pleading guilty to criminal conduct in connection with the Settlement Agreement and subsequent PAC contributions.

120.   The harm to Mr. Burum from Defendants Randles and Schreiber's illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

121.   Defendants Randles and Schreiber's conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

## FOURTH CLAIM

### *Monell* Claim – 42 U.S.C. § 1983

### Against Defendant County

122.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 121 of this Complaint as though fully set forth herein.

123.   Mr. Burum exercised his First and Fifth Amendment rights as set forth above.  The individual Defendants, acting under color of state law, then retaliated against Mr. Burum in the manner alleged herein for participation in what Defendants knew were First and Fifth Amendment protected activities.

124.   The County had in place official, widespread, and/or longstanding

policies, practices, and/or customs that amounted to deliberate indifference to Mr. Burum's right to exercise his constitutional rights without government retaliation. These policies, practices, and/or customs were a moving force behind this illegal retaliatory conduct.  Specifically, the County maintained or permitted policies, practices, and/or customs that included the following:

    a) Permitting, condoning, and/or ratifying the District Attorney's office to engage its investigators and resources in politically-charged criminal investigations without regard for the existence of credible evidence;

    b) Permitting, condoning, and/or ratifying County employees in the District Attorney's Office to execute falsified search warrants and engage in unwarranted criminal investigations in a manner intended to punish, harass, and embarrass as retaliation;

    c) Permitting, condoning, and/or ratifying collusive action between the District Attorney's Office and other County employees for the purpose of engaging in unwarranted criminal investigations in a manner intended to punish, harass, and embarrass as retaliation;

    d) Permitting, condoning, and/or ratifying the District Attorney's Office to target constitutionally-protected First Amendment speech through unwarranted criminal investigations for the purpose of chilling such speech; and

    e) Permitting, condoning, and/or ratifying the Public Integrity Unit of the District Attorney's Office to employ investigators dedicated to working on Public Integrity Unit investigations, thereby removing important checks and balances between investigators and prosecutors.

125.    Additionally, Defendant Ramos as the District Attorney is an official with final policymaking authority as it relates to the District Attorney's Office's criminal investigations.  As such, his conduct alleged herein—including his

supervision of the Public Integrity Unit and his conscious, affirmative ratification of the wrongful and retaliatory criminal investigation of Colonies and Mr. Burum— constituted an act of official government policy.

126.   As a legal and proximate result of the County's policies, practices, and/or customs alleged herein, and/or Defendant Ramos's conduct as an official with final policymaking authority, the County violated Mr. Burum's right to exercise his constitutional rights without government retaliation, causing him to suffer injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

127.   The County's conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages.

### FIFTH CLAIM

### Supervisorial Liability – 42 U.S.C. § 1983

### Against Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and Schons

128.   Plaintiff re-alleges and incorporates each allegation in Paragraphs 1 through 127 of this Complaint as though fully set forth herein.

129.   On information and belief, Defendant Ramos supervised Defendants Cope, Hackleman, Randles, and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Ramos knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Ramos's training, supervision, and/or control of Defendants Cope, Hackleman, Randles, and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

130.   On information and belief, Defendant Cope supervised Defendants Randles and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Cope knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Cope's training, supervision, and/or control of Defendants Randles and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

131.   On information and belief, Defendant Hackleman supervised Defendants Cope, Randles, and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Hackleman knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Hackleman's training, supervision, and/or control of Defendants Cope, Randles, and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

132.   On information and belief, Defendant Brown supervised Defendants Mandel and Schons with regard to their conduct alleged herein.  In this capacity, Defendant Brown knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Brown's training, supervision, and/or control of Defendants Mandel and Schons was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

133.   On information and belief, Defendant Harris supervised Defendant Mandel with regard to her conduct alleged herein.  In this capacity, Defendant Harris knew or should have known of Defendant Mandel's illegal retaliatory

conduct, yet she failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, AG Harris's training, supervision, and/or control of Defendant Mandel was a legal and proximate cause of her illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

134.   On information and belief, Defendant Mandel supervised Defendants Randles and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Mandel knew or should have known of their illegal retaliatory conduct, yet she failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Mandel's training, supervision, and/or control of Defendants Randles and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

135.   On information and belief, Defendant Schons supervised Defendants Randles and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Schons knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Schons's training, supervision, and/or control of Defendants Randles and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

136.   The supervisory Defendants' conduct as described herein was so closely related to the deprivation of Mr. Burum's rights as to be the moving force that caused the ultimate injury.  Further, each of the supervisory Defendants was acting under color of state law.

137.   As a legal and proximate result of Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and Schons's supervisorial conduct, Mr. Burum's right to exercise his constitutional rights without government retaliation

was violated, causing Mr. Burum to suffer injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

138.   Defendants Ramos, Cope, Hackleman, Brown, Harris, Mandel, and Schons's supervisorial conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages.

## SIXTH CLAIM

### Conspiracy – 42 U.S.C. § 1983

### Against All Defendants

139.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 138 of this Complaint as though fully set forth herein.

140.   Defendants formed a combination of two or more persons acting in concert to commit the individual acts described above, the principal element of which was the agreement between the Defendants to illegally retaliate against Mr. Burum and deprive Mr. Burum of his constitutional rights.

141.   Defendants combined, colluded, conspired, and/or agreed to act in concert to wrongfully investigate and prosecute Mr. Burum for the purpose of retaliating against Mr. Burum for engaging in litigation against the County and District, for achieving the Settlement Agreement, and for making political contributions, all as alleged herein.

142.   Defendants performed overt acts in furtherance of the conspiracy as alleged herein.

143.   This conspiracy was the proximate cause of the illegal retaliation against Mr. Burum and the deprivation of Mr. Burum's constitutional rights, as alleged herein.

144.   As a direct result of Defendants' conspiracy, Mr. Burum suffered

injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

145.   Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

## SEVENTH CLAIM

### Malicious Prosecution – California State Law

### Against Defendants Aleman and Gonzales

146.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 145 of this Complaint as though fully set forth herein.

147.   Defendants Aleman and Gonzales assisted in initiating and directing Mr. Burum's prosecution by offering malicious and false information about Mr. Burum and Colonies to investigators, a grand jury, and at trial.

148.   Defendant Aleman assisted in initiating the proceeding against Mr. Burum by knowingly making false statements to Defendants Randles and Schreiber during his November 1, 2008, and other interviews prior to Mr. Burum's indictment, and offering false testimony during both his grand jury and trial testimony, all as alleged above.

149.   Defendant Gonzales assisted in initiating the proceeding against Mr. Burum by knowingly making false statements to Defendant Randles and Senior Investigator Morey Weiss during her interviews prior to Mr. Burum's indictment, and offering false testimony during both his grand jury and trial testimony, all as alleged above.

150.   Defendants Gonzales has also testified that she made a report to the District Attorney's Public Integrity Unit soon after Colonies entered into the Settlement Agreement.  On information and belief, this report included false information regarding Colonies and Mr. Burum in connection with the Settlement

51

1    Agreement.

2         151.   In taking the actions alleged above, Defendants Aleman and Gonzales

3    both acted with malice against Mr. Burum.

4         152.   Defendants Aleman and Gonzales acted for reasons other than a

5    legitimate belief that Mr. Burum had committed any crimes.  Defendant Aleman

6    acted for the reason that his statements and testimony would cause him to obtain

7    leniency in his own criminal case.  Defendant Gonzales acted for the reasons that

8    she believed her statements and testimony would assist in both criminally

9    prosecuting Mr. Burum without probable cause, a result she believed would punish

10   Mr. Burum for his harsh criticisms of her and the County, and in furthering the

11   County's plot to obtain both Colonies' property and the return of the $102 million

12   settlement payment, a result she believed would punish Mr. Burum and Colonies

13   and be helpful in her future election campaigns.

14        153.   Mr. Burum was held to answer at trial, without probable cause, based

15   on the knowingly false statements and perjured testimony offered by Defendants

16   Aleman and Gonzales.

17        154.   The criminal case against Mr. Burum was legally terminated in his

18   favor when the jury found him not guilty on all remaining charges on August 28,

19   2017.

20        155.   The harm to Mr. Burum from Defendants Aleman and Gonzales's

21   illegal actions includes lost income, lost business opportunities, loss of reputation,

22   litigation expenses including attorneys' fees, and other compensatory damages, in

23   an amount to be proved at trial.

24        156.   Defendants Aleman and Gonzales's conduct was willful, wanton,

25   malicious, and done with reckless disregard for Mr. Burum's rights and therefore

26   warrants the imposition of exemplary and punitive damages as to each of them.

27

28

## EIGHTH CLAIM

### Negligence

### Against All Defendants

157.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 156 of this Complaint as though fully set forth herein.

158.   Defendants owed a duty to Mr. Burum to act reasonably in the criminal investigating against him so as not to cause Mr. Burum undue harm, and a duty to adequately investigate all reasonable leads and evidence.

159.   Defendants breached their duty to Mr. Burum to act reasonably in his criminal investigation by instead, as alleged above, unreasonably engaging in a biased and unfair investigation designed to retaliate against Mr. Burum and Colonies for their success in the civil litigation, subsequent PAC contributions, and public statements made about the County, District, and various County employees and officials.  Nor did Defendants adequately investigate all reasonable leads and evidence, as alleged above, including failing to adequately investigate the veracity of statements made by key prosecution witnesses such as Defendants Aleman and Gonzales.  These breaches were a substantial factor in causing Mr. Burum's unjustified prosecution and resulting harm.

160.   The harm to Mr. Burum from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

## NINTH CLAIM

### Intentional Infliction of Emotional Distress

### Against All Defendants

161.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 160 of this Complaint as though fully set forth herein.

162.   Defendants' actions as alleged above were extreme and outrageous,

53

including but not limited to falsifying evidence and eliciting false testimony to secure indictment without probable cause, and knowingly pursuing an unwarranted investigation and meritless charges in order to subject Mr. Burum to six years of retaliatory criminal prosecution.

163.   Defendants' actions as alleged above were intended to cause Mr. Burum emotional distress or were taken with reckless disregard of the probability that Mr. Burum would suffer emotion distress.

164.   Defendants' actions as alleged above caused Mr. Burum severe humiliation, embarrassment, mental anguish, and emotional distress.

165.   The harm to Mr. Burum from Defendants' illegal actions includes injury to his person from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

166.   Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF demands judgment against Defendants for the following relief:

A.   Damages of no less than $50 million, but in an amount ultimately to be proven at trial, including, but not limited to:

      a.  Compensatory damages, including for injury to person, lost income, lost business opportunities, and loss of reputation; and

      b.  Punitive damages.

B.   An award of reasonable attorneys' fees, costs, and expenses to Plaintiff, pursuant to 42 U.S.C. § 1988, in an amount to be proven at trial;

C.    For costs of suit herein incurred;

D.    Pre-judgment interest;

E.    Such other and further relief as this Court shall find just and proper.

Dated:  April 2, 2018                          **LARSON O'BRIEN LLP**


                                               By:  /s/ Stephen G. Larson
                                                    Stephen G. Larson
                                                    Jonathan E. Phillips
                                                    Attorneys for Plaintiff
                                                    JEFFREY S. BURUM


## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.


Dated:  April 2, 2018                          **LARSON O'BRIEN LLP**


                                               By:  /s/ Stephen G. Larson
                                                    Stephen G. Larson
                                                    Jonathan E. Phillips
                                                    Attorneys for Plaintiff
                                                    JEFFREY S. BURUM

COMPLAINT