1  Stephen G. Larson (SBN 145225)
2  *slarson@larsonobrienlaw.com*
   Steven E. Bledsoe (SBN 157811)
3  *sbledsoe@larsonobrienlaw.com*
4  Steven A. Haskins (SBN 238865)
   *shaskins@larsonobrienlaw.com*
5  Erica R. Graves (SBN 301785)
6  *egraves@larsonobrienlaw.com*
   **LARSON O'BRIEN LLP**
7  555 South Flower Street, Suite 4400
8  Los Angeles, CA  90071
   Telephone:  213.436.4888
9  Facsimile:   213.623.2000

10 Attorneys for Plaintiff
11 JEFFREY S. BURUM

12          UNITED STATES DISTRICT COURT

13         CENTRAL DISTRICT OF CALIFORNIA -

14                EASTERN DIVISION

15 JEFFREY S. BURUM                      CASE NO. 5:18-cv-00672 JGB (SHKx)

16              Plaintiff,               **SECOND AMENDED COMPLAINT**
                                         **FOR:**
17      v.                               **(1) RETALIATION (42 U.S.C.**
                                         **§ 1983);**
18 COUNTY OF SAN BERNARDINO;             **(2) MALICIOUS PROSECUTION**
19 MICHAEL A. RAMOS, in his              **(42 U.S.C. § 1983);**
   individual capacity; R. LEWIS COPE,   **(3) FABRICATION OF EVIDENCE**
20 in his individual capacity; JAMES     **(42 U.S.C. § 1983);**
   HACKLEMAN, in his individual
21 capacity; HOLLIS "BUD" RANDLES,       **(4) *MONELL* CLAIM (42 U.S.C.**
   in his individual capacity; ROBERT    **§ 1983);**
22 SCHREIBER, in his individual          **(5) SUPERVISORIAL LIABILITY**
23 capacity; JOSIE GONZALES, in her      **(42 U.S.C. § 1983);**
   individual capacity; RUTH             **(6) CONSPIRACY (42 U.S.C.**
24 STRINGER, in her individual capacity; **§ 1983);**
25 ADAM ALEMAN, in his individual        **(7) NEGLIGENCE;**
   capacity; EDMUND G. BROWN, JR.,
26 in his individual capacity; MELISSA   **(8) INTENTIONAL INFLICTION**
27 MANDEL, in her individual capacity;   **OF EMOTIONAL DISTRESS**
                                         **[DEMAND FOR JURY TRIAL]**
28

1
2   and GARY SCHONS, in his individual
    capacity
3                    Defendants.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.     Plaintiff Jeffrey S. Burum brings this action seeking compensatory and punitive damages against Defendants COUNTY OF SAN BERNARDINO ("County"), MICHAEL A. RAMOS, R. LEWIS COPE, JAMES HACKLEMAN, HOLLIS "BUD" RANDLES, ROBERT SCHREIBER, JOSIE GONZALES, RUTH STRINGER, ADAM ALEMAN, EDMUND G. BROWN, JR., MELISSA MANDEL, and GARY SCHONS for violations of Mr. Burum's civil and other rights under the U.S. Constitution and under California law.

2.     Mr. Burum's claims are based on an illegal campaign of retaliation, intimidation, and harassment by the County and the State of California, via their employees.  Mr. Burum is one of the managing members of Colonies Partners, L.P.'s ("Colonies") general partner.  In that role, Mr. Burum directed much of Colonies' business and legal efforts, and ultimately became the public face of Colonies' high-profile legal dispute with the County and the San Bernardino County Flood Control District ("District").  When Defendants and other government officials realized that the dispute had resolved favorably for Colonies and embarrassed the County and District, Defendants targeted Mr. Burum (as well as other of Colonies' partners) as part of their unlawful retaliation campaign against Colonies resulting from Mr. Burum's and Colonies' exercise of their First and Fifth Amendment rights.

3.     This exercise of fundamental constitutional rights began when Colonies, under Mr. Burum's leadership and guidance, exercised its Fifth Amendment right to receive just compensation for the uncompensated "taking" of 72 acres of its land by Defendants County and District for a regional flood control facility.  Then, in connection with the civil litigation that resulted from this taking, Colonies and Mr. Burum exercised their First Amendment free speech rights to petition the government and advocate for settlement.  As a result of these constitutionally-protected efforts, Colonies secured a $102 million civil settlement in 2006 from Defendants County and the District (the "Settlement Agreement").

1

Finally, following the settlement, Colonies continued to exercise its free speech rights, again under the leadership and guidance of Mr. Burum, by making political contributions to general purpose political action committees ("PACs") affiliated with pro-development politicians, including members of the San Bernardino County Board of Supervisors and others who had supported the settlement.  As Mr. Burum made clear in public statements, including to various media outlets, the goal of these PAC contributions was to support pro-development politicians who would root out the intransigent and corrupt elements of the County that had plagued the Colonies civil litigation.  In time, Mr. Burum's own public profile increased, and he became a high-profile advocate for political causes in his own right.

4.     The Defendants' retaliatory campaign developed and manifested in several ways, but no more so than in an effort jointly coordinated by the offices of the San Bernardino County District Attorney and the California Attorney General to target Colonies, Mr. Burum (and the Colonies partners) through an unfounded criminal investigation conducted without justification or probable cause.  This retaliatory investigation ultimately resulted in felony charges being brought against Mr. Burum, more than six years of criminal litigation, and a ten-month criminal trial in San Bernardino Superior Court in the case entitled *People v. Biane, et al.*, Case No. FSB 1102102 (the "Criminal Action").

5.     Because the investigation's motivating and ultimate goal was to punish Colonies and its management, including Mr. Burum, and not to conduct a legitimate and fair examination of the facts, it was no surprise that the prosecution's case was marred by repeated use of fabricated evidence and perjured testimony; indeed, it was so weak that Mr. Burum did not need to call a single witness in his defense.  On August 28, 2017, the next court day after the jury deliberations began, the jury acquitted Mr. Burum on all remaining charges, with the court having already dismissed several charges for numerous legal and/or factual deficiencies. Mr. Burum was vindicated.

6.     There was never any credible evidence of criminal conduct involving the Settlement Agreement or subsequent PAC contributions—just Defendants' relentless drive to punish Colonies and Mr. Burum for having exercised their constitutional rights, and to chill Colonies and Mr. Burum from daring to exercise their constitutional rights in the future.

7.     Defendants' wanton disregard of Mr. Burum's constitutional rights violates 42 U.S.C. § 1983 and California law.  As a direct and proximate result of Defendants' actions, Mr. Burum has suffered and will continue to suffer damages. For these reasons, and as set forth below, Mr. Burum is entitled to compensatory damages, punitive damages, attorneys' fees and costs, pre-judgment interest, and all other relief provided by law.

## JURISDICTION AND VENUE

8.     This case arises under 42 U.S.C. § 1983 and California law.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a).

9.     Pursuant to California Government Code §§ 810 et seq., Mr. Burum filed his state law claims with Defendant County and the State of California on January 31, 2018.  On March 13, 2018, the State, through its Government Claims Program, rejected Mr. Burum's claim, stating that because it "involves complex issues that are beyond the scope of analysis and legal interpretation typically undertaken by the GCP," it was "being rejected so you can initiate court action." On March 23, 2018, the County returned Mr. Burum's claim "without any action having been taken on it."  The County stated that it was returning the claim "because it was not presented within the time required by law."  Because Mr. Burum's claims were, in fact, filed timely pursuant to California law, the County's response is appropriately interpreted as a denial of all claims.  Pursuant to Government Code § 945.6, Mr. Burum originally filed these claims with this Court on April 2, 2018, and now files this Second Amended Complaint.

3

10.     Venue is proper in the Central District of California under 28 U.S.C. § 1391 (b)(1) and (2), because the majority of Defendants reside in this District and substantial acts and omissions giving rise to Mr. Burum's claims occurred in this District.

## THE PARTIES

11.     Plaintiff Jeffrey S. Burum is an individual residing in Rancho Cucamonga, California.  He is the co-managing member of the managing partner of Colonies Partners, L.P., a California limited partnership with its principal place of business in Rancho Cucamonga, California.

12.     Defendant County of San Bernardino is a municipal corporation organized and existing under the laws of the State of California.  Defendant County was at all relevant times mentioned herein responsible for its own actions and/or omissions as well as the actions and/or omissions and the policies, procedures, customs, and practices of the San Bernardino County District Attorney's Office.

13.     At all relevant times, Defendant Michael Ramos was the District Attorney of the County of San Bernardino.  In that capacity, he is the official responsible for setting and enforcing the policies, customs, and practices of the District Attorney's Office.  Defendant Ramos at all relevant times directed, supervised, authorized, and/or ratified the actions of his office's employees, agents, and officials as alleged herein.  Together with then-Attorney General Jerry Brown, Defendant Ramos directed the illegal investigation against Colonies and its partners, including Mr. Burum.  In that role, Defendant Ramos had direct involvement in the investigation, and supervised the investigation by directing the investigation team to gather evidence using illicit means.

14.     At all relevant times, Defendant R. Lewis Cope was a Deputy District Attorney for the County of San Bernardino in the District Attorney's "Public Integrity Unit" and was a supervisor in that unit.  Defendant Cope is employed by and is an agent of Defendant County and the District Attorney's Office.  Defendant

4

Cope was one of the lead prosecutors from the District Attorney's Office assigned to prosecute Mr. Burum.  But before there was a case to prosecute, Defendant Cope was assigned as a member of the team created with individuals in both the Attorney General's Office and the District Attorney's Office to investigate Colonies and its partners, including Mr. Burum.  As a member of that team, Defendant Cope assumed the duties of directing and participating in the retaliatory criminal investigation, including directing, supervising, authorizing, and/or ratifying the actions of the joint District Attorney/Attorney General investigation team.

15.    At all relevant times until October 2011, Defendant James B. Hackleman was a Deputy District Attorney for the County of San Bernardino, and the lead prosecutor in the "Public Integrity Unit."  Defendant Hackleman was a key member of the team assigned to gather information about and investigate Colonies and its partners, including Mr. Burum.  To ensure that the investigation could go forward, Defendant Hackleman assumed the duties of directing and participating in the retaliatory criminal investigation, including directing, supervising, authorizing, and/or ratifying the actions of the Public Integrity Unit's other employees, agents, and officials working on the Criminal Action.

16.    At all relevant times, Defendant Hollis "Bud" Randles was an Investigator in the San Bernardino County District Attorney's office.  Defendant Randles was an investigator, employed by the San Bernardino District Attorney's Office, but assigned to the team created as a joint effort between the District Attorney's Office and the Attorney General's Office to investigate and gather evidence against Colonies and its partners, including Mr. Burum.  As such, Defendant Randles was directed by other members of the investigation team to use any means necessary to gather information that would support a lengthy, embarrassing, and retributive criminal investigation.  Defendant Randles followed those instructions as one of the lead investigators in the resulting retaliatory criminal investigation.

17.     At all relevant times, Defendant Robert Schreiber was an Investigator in the San Bernardino County District Attorney's office.  Defendant Schreiber was employed by the San Bernardino District Attorney's Office, but assigned to the team created as a joint effort between the District Attorney's Office and the Attorney General's Office to investigate and gather evidence against Colonies and its partners, including Mr. Burum.  As such, Defendant Schreiber was directed by other members of the investigation team to use any means necessary to gather information that would support a lengthy, embarrassing, and retributive criminal investigation.  Mr. Schreiber followed those instructions as one of the lead investigators in the resulting retaliatory criminal investigation.

18.     At all relevant times, Defendant Josie Gonzales was the Supervisor for the Fifth District of San Bernardino County.  Defendant Gonzales initiated and participated in the retaliatory criminal investigation into Colonies and its partners, including Mr. Burum.

19.     At all relevant times until October 2010, Defendant Ruth Stringer was an attorney with the County Counsel's Office for the County of San Bernardino. Defendant Stringer participated in and encouraged the retaliatory criminal investigation into Colonies and its partners, including Mr. Burum.

20.     At all relevant times until December 2006, Defendant Adam Aleman was a Field Representative and assistant to then-Supervisor Bill Postmus.  Then, until July 2008, Defendant Aleman was Assistant Assessor for the County of San Bernardino.  Thereafter, Defendant Aleman was a cooperating witness who initiated and participated in the retaliatory criminal investigation into Colonies and its partners, including Mr. Burum.

21.     At all relevant times until January 2011, Defendant Edmund G. Brown, Jr., was the Attorney General for the State of California.  Together with Defendant Ramos, Defendant Brown led the team investigating Colonies and its partners, including Mr. Burum.  In that role, Defendant Brown had direct

6

involvement in the investigation, and supervised the investigation by directing others to gather evidence using illicit means.

22.     At all relevant times, Defendant Melissa Mandel was a Supervising Deputy Attorney General for the State of California.  Defendant Mandel is employed by and is an agent of the State of California and the Attorney General's Office.  With Defendant Cope, Defendant Mandel was one of the lead prosecutors assigned to prosecute Mr. Burum.  But before there was a prosecution, she was assigned to the investigation team created with individuals in both the Attorney General's Office and the District Attorney's Office to investigate Colonies and its partners, including Mr. Burum.  As such, she directed and participated in the retaliatory criminal investigation, including directing, supervising, authorizing, and/or ratifying the actions of the joint District Attorney/Attorney General investigation team.

23.     At all relevant times until October 2011, Defendant Gary Schons was a Deputy Attorney General for the State of California.  He was employed by and was an agent of the State of California and the Attorney General's Office.  Defendant Schons was one of the prosecutors assigned to prosecute Mr. Burum.  But before there was a prosecution, he was assigned to the investigation team created with individuals in both the Attorney General's Office and the District Attorney's Office to investigate Colonies and its partners, including Mr. Burum.  As such, he directed and participated in the retaliatory criminal investigation, including directing, supervising, authorizing, and/or ratifying the actions of the joint District Attorney/Attorney General investigation team.

24.     In taking the actions alleged herein, Defendants acted under color of law, with the exception of the County's actions in connection with the Colonies civil litigation and settlement (as alleged in Paragraphs 26-35 below).

25.     As set forth below, Defendants conspired with each other and others to illegally retaliate against, intimidate, and harass Colonies for asserting its First and

7

Fifth Amendment rights, successfully resolving its dispute with the County and District, and for participating in the political process.

## FACTUAL ALLEGATIONS

### Civil Litigation Over the Uncompensated Taking of Colonies' Land, the Settlement, and Colonies' Post-Settlement Political Contributions

26.     The County's long campaign to deprive Mr. Burum and Colonies of their rights began in 1999 when Colonies refused to be victimized by the County and District's efforts to unlawfully take 72 acres of prime developable land, without just compensation, to build a regional flood control facility.  In 1997, Colonies purchased 434 acres of land in Upland, California for development.  When the County and other entities built the 210 freeway extension through Colonies' property, they needed a large area in which to contain the massive water runoff caused by that project and the related 20th Street Storm Drain.  The 20th Street Storm Drain was a regional flood-control facility built in Upland to provide 100-year flood protection for the below-grade portion of the 210 freeway west of Colonies' property.  The 20th Street Storm Drain ended in a 12-foot-by-14-foot concrete outlet located on the western edge of Colonies' property.  Instead of appropriately exercising their power of eminent domain over Colonies' land, or even simply offering to fund the necessarily huge flood control basin, the County and District set out to force Colonies to build the flood control facility itself, on Colonies' own land, and at its own expense.

27.     In 1999, the District's executive director, Ken Miller—knowing that water runoff from the 210 freeway project would be torrential and would require construction of a new, vast, expensive flood control facility—attempted to trick Colonies into agreeing to hand over the land and build the basin itself.  He did so by lying about the amount of water involved and the necessary size of the flood control facility.  The truth was that existing flood control facilities were utterly inadequate to contain the up to 80 million gallons of water per hour that could be unleashed

8

onto the property through the 20th Street Storm Drain.  Despite having no legal obligation to do so, Colonies offered to end the dispute by giving the County and District the necessary acreage so long as the County and District would pay for the construction of a basin sufficient to control the new storm waters resulting from the 210 freeway project and the 20th Street Storm Drain.  The County and District refused.

28.     Instead, the County and District, spurred by their attorneys, some of the County Supervisors, and District management, stubbornly insisted that limited easements dating from the 1930s permitted them to redirect the massive flood waters created by the freeway's construction onto Colonies' land—and that it was then Colonies' responsibility to construct and pay for the necessary regional flood control facilities.

29.     The County and District also tried to argue that they had obtained "consent" from Colonies in 1999, conveniently ignoring that the only "consent" was as to the physical and geographic placement of the 20th Street Storm Drain, and that even this limited "consent" was based on fraud and deceit.  Colonies never consented to the County or District diverting flood water onto Colonies' property without just compensation.

30.     As one of Colonies' managing partners, and Colonies' primary representative in the course of meetings and negotiations with the County, Mr. Burum saw firsthand the duplicity of County and District staff.  Far from ensuring public safety and sound government practice, County and District staff were repeatedly willing to jeopardize not only the Colonies project, but public health and safety by failing to provide adequate infrastructure to safely collect and disperse water runoff from the newly-constructed 210 freeway.  Mr. Burum vocally criticized the government for its mishandling of the Colonies project, publicly expressing his concern about County and District practices.

31.     Facing an intransigent County and District, and with the 20th Street Storm Drain on the verge of being "turned on" with no facilities to contain the resultant flood waters, Colonies had no other option than to file a quiet title action in March 2002 to vindicate its property rights.  That action went to trial in 2003 before San Bernardino County Superior Court Judge Peter H. Norell.  Mr. Burum testified on Colonies' behalf during that trial.  Colonies won the action when Judge Norell ruled that the County and District had no right to divert and dump flood water onto Colonies' property without just compensation.  Undeterred, and still refusing to take responsibility for their actions, the County and District doubled down and appealed the decision, leading to a second trial on the issue three years later.

32.     In the meantime, recognizing that the lack of adequate flood control facilities posed a grave threat to public safety, Colonies built a new flood control basin on its own land and at its own expense, rushing to finish it before an anticipated El Niño winter deluge in 2003-04.  Shockingly, the County and District's lawyers and public safety officers at this point turned on a dime:  After years of haranguing, cajoling, urging, and threatening Colonies to build the basin, they now filed a petition for writ of supersedeas to *stop* Colonies from constructing the basin—an all-too transparent effort to gain a litigation advantage in the pending appeal.  Fortunately, the Court of Appeal rejected this ill-conceived gambit, recognizing that the County and District's interference posed an imminent threat to public safety.

33.     The seven-year civil battle over Colonies' land ultimately came to a head in a second trial before San Bernardino County Superior Court Judge Christopher J. Warner in 2006.  After hearing six weeks of testimony, Judge Warner released a blistering statement of intended decision on July 31, 2006, finding not only that Colonies was legally right, but also confirming that the County and District had peddled in fraud, coercion, and deceit.  Among other things, Judge

10

Warner found that:

a)   The County and District's claimed easements were insufficient to
     justify the necessary flood control facilities, and thus the County and
     District's actions constituted a "gross surcharge" that permanently
     extinguished any easements on Colonies' land—meaning the County
     and District had no right to dump *any* water onto the property;

b)   The County and District had played "hide the ball," engaged in
     "deceit," and tried to "coerce" Colonies into giving up its land rights;

c)   The County and District had held Colonies' development "hostage" in
     an effort to get free flood control construction and had "unreasonably
     and unjustifiably interfere[d] with [Colonies'] business";

d)   The County and District had "turned on" the 20th Street Storm Drain
     in 2002 "without providing for any viable flood-control facilities on
     [Colonies'] property and without ensuring public safety from the
     flooding hazard"; and

e)   Colonies had taken "every reasonable action to protect the public"
     even in the face of the County and District's "deceit and
     misinformation."

34.   Mr. Burum again testified on Colonies' behalf during this second trial
before Judge Warner.  In his statement of intended decision, Judge Warner held that
Mr. Burum was "a very credible witness" who "answered questions directly,
succinctly, and without hesitation and equivocation."  In the eyes of County and
District staff, this praise of Mr. Burum was bad enough, but it was worse when
contrasted to the Court's description of County witnesses.  The Court criticized the
credibility and veracity of multiple County and District staff who testified at trial,
including District directors Mr. Miller and Patrick Mead.  The Court's adoption of
Mr. Burum's testimony over the testimony of these District employees added a
viscerally personal angle to the County's dispute with Colonies.

35.    Judge Warner's statement of intended decision was a watershed moment in the dispute.  County attorney Mitchell Norton later told investigators that Judge Warner's opinion was "Armageddon" for the County and District.  He explained that had Judge Warner's intended decision become final, it would have paved the way for Colonies to recover upwards of $300 million in damages in an inverse condemnation action that had been stayed pending resolution of the quiet title case.  Moreover, Judge Warner's multiple findings of bad faith by the County and District would have severely threatened their attempts to obtain indemnification from the other government agencies involved in the 210 freeway expansion.

36.    Facing this dire legal position, four out of the five County Supervisors repeatedly voted in favor of settlement—yet County lawyers and officials continued to do everything possible to stop a settlement.  For example, Mr. Norton bragged that he had inserted "poison pills" into a draft settlement agreement for the purpose of sabotaging the agreement.  And Defendant Stringer refused to sign off on the legality of the settlement even though she later admitted having very little involvement with, or understanding of, the underlying civil litigation, and therefore no basis on which to decide that the proposed settlement was unlawful or even improvident.

37.    The County and District's high-priced outside attorneys—who had just lost the Colonies trial—likewise had no basis to justify their opposition to settlement.  The County and District had unwisely spent millions of dollars on law firms whose lawyers had little or no background in land disputes.  Embarrassed by their repeated defeats, these outside attorneys joined County Counsel and other County and District officials in digging their heels in, trying to scuttle the settlement, and championing further appeal and delay.

38.    In the months following Judge Warner's tentative decision, Mr. Burum repeatedly commented publicly on the County and District's intransigence, causing the County, District, and their employees further public embarrassment.  Mr.

12

Burum openly advocated for a settlement of the dispute, and also offered sharp, public criticism of the County's Board of Supervisors and staff.  Among Mr. Burum's public statements were the following:

a)  "Politics has more to do with their inability to make a settlement offer than the law.  If these were two private-sector companies, they would have settled this.  [The County and District] know that they are wrong."

b)  "The [Court's tentative] ruling is a victory for private property owners all over the state and nation who have been bullied and victimized by the government."

c)  "Judge Warner's ruling shows you can fight City Hall – and win."

d)  "[The County] certainly had many opportunities to settle with us but they've snubbed us and the public, choosing to waste the public's money on lawyers instead.  The County's response today is just the latest example of their arrogance and abuse of power."

e)  "The Board of Supervisors has recklessly spent taxpayer dollars, trampled private property rights and endangered public safety by refusing to provide flood protection."

f)  "[The County engaged in] shameful behavior toward the Colonies Partners."

g)  "I find [the County's] response alarming both for the taxpayers and Colonies.  As a taxpayer of San Bernardino County, I am disappointed that the actions of politicians on the Board of Supervisors are going to cost us all additional millions of dollars."

h)  "This offer could hardly be considered a sign of good faith.  It's more consistent with the pattern of behavior [Judge Warner] used to describe the county – deceitful."

39.  As a result of the litigation and Mr. Burum's high-profile criticisms,

13

the County suffered a steady stream of negative press articles and public opinion expressing concern that the County and District's incompetence and misconduct had exposed taxpayers to such massive risk.

40.     As part of the effort to informally resolve the litigation, Mr. Burum also actively and directly petitioned members of the Board of Supervisors and other County officials and employees to accept responsibility for the County and District's actions and reasonably settle the dispute.

41.     Colonies, acting through its co-managing partner, Mr. Burum, employed a multi-pronged strategy to effectively exercise its First Amendment rights in its dispute against the government.  In addition to litigating the dispute in court, Colonies actively participated in the political process.  It retained professionals such as former California State Senator James Brulte and media consultant Patrick O'Reilly, both of whom were integral to Colonies' direct communications with County Supervisors and its efforts to shape public discourse regarding the dispute.  These efforts publicized the role of County officials, lawyers, and staff in botching the dispute, angering these individuals and giving them additional motive for retaliatory action.  During this time period, Mr. Burum was identified in local newspapers as "the principal face" of Colonies' efforts.

42.     For several years prior to the Colonies settlement, Colonies had been effective in exercising lawful political influence and convincing voters to upend the do-nothing status quo.  Mr. Burum was very much the architect and public face of these political efforts.  In 2002, Colonies publicly and aggressively opposed the re-election campaign of then-Supervisor Jon Mikels of the Second District—the district in which the development was located.  Mr. Burum and his co-managing partner, Dan Richards, had met with Mr. Mikels prior to filing Colonies' lawsuit to discuss informally resolving the dispute.  Mr. Mikels rudely and vulgarly rejected Colonies' efforts, declaring his absolute opposition to even negotiating a settlement. Rejected by their own Board representative, Colonies unsurprisingly supported Mr.

14

Mikels' opponent, Rancho Cucamonga City Councilman Paul Biane, who won the 2002 supervisorial election by a large margin.  Several individual Colonies partners, including Mr. Burum, also directly donated to Mr. Biane's campaign.  Colonies also financially supported Ontario Mayor Gary Ovitt—another staunchly pro-development politician—in his successful 2004 run for Supervisor.  Colonies' successful engagement in the political process scared and inflamed others who realized that Mr. Burum's and Colonies' vigorous public participation could be turned against them as well.  It also concerned County lawyers and staff who were worried that newly-elected officials might not automatically defer to their self-proclaimed expertise.  So, when Colonies and Mr. Burum's persistence in court and in petitioning the government eventually succeeded, Defendants were unwilling to let Colonies and Mr. Burum's success in enforcing Colonies' rights go unanswered.

43.    County Supervisors also became enraged at Colonies and Mr. Burum when, in Fall 2006—at a contentious time in settlement negotiations after Judge Warner's tentative opinion—Colonies expended hundreds of thousands of dollars to oppose San Bernardino County's proposed "Measure P."  Measure P purported to be a term-limit proposal, but its passage would have meant a 50% increase in salary for members of the San Bernardino County Board of Supervisors.  The Board of Supervisors had voted to put Measure P on the ballot, and Colonies opponents Dennis Hansberger and Defendant Gonzales had taken public positions in support of Measure P.  In opposing Measure P, Mr. Burum—on behalf of Colonies—declared that the Board of Supervisors had "recklessly spent taxpayer dollars, trampled private property rights and endangered public safety by refusing to provide flood protection" and for these reasons should not be voted a raise, and certainly not under the guise of adopting term limits.

44.    Indeed, over the course of Colonies' dispute with the County and District, Mr. Burum's name appeared dozens of times in local media, always on Colonies' behalf and generally accompanied by pointed and aggressive criticism of

15

the County, its elected officials, and its staff.

45.     On November 28, 2006, Colonies, the County, and the District settled the bitter four-year litigation and seven-year public fight over the unlawful "taking" of Colonies' land.  Facing hundreds of millions in damages and the prospect of unending attorneys' fees, the Board of Supervisors voted 3-2 to approve a $102 million settlement in exchange for Colonies releasing all of its damages claims and deeding the subject land to the District for its flood control purposes.  Supervisors Postmus, Ovitt, and Biane voted in favor of the settlement; Supervisor Hansberger and Defendant Gonzales voted against.  Defendant Gonzales had consistently supported settlement until the eleventh hour.  On information and belief, she changed her vote to avoid the political consequences she feared would flow from her support for a large settlement.  She also had her own large donors to appease, some of whom were competitors of Colonies and had benefited from the distraction that protracted litigation had imposed upon Colonies.

46.     In 2007, months after the settlement vote, Colonies—under Mr. Burum's leadership—again exercised its First Amendment rights of free speech and petition by making political donations to PACs associated with members of the Board of Supervisors, and others, who had supported the settlement and who would advance pro-development policies.  Colonies and Mr. Burum hoped that these contributions would help get politicians elected who not only would support further development in the Inland Empire, but would exercise appropriate authority and oversight over the County's lawyers and staff so as to avoid future legal debacles.

### The Unlawful Investigation

47.     No sooner was the ink dry on the Settlement Agreement than upset and embarrassed elements within the County apparatus began planning their retaliation. And they were eventually joined by new allies:  The San Bernardino County District Attorney's Office and California Attorney General's Office.  Angered over the civil litigation, the Settlement Agreement, and the 2007 PAC contributions, and

16

motivated by illegal and improper purposes, but without any credible evidence of wrongdoing, Defendants orchestrated a campaign to punish Colonies and its chief spokesman, Mr. Burum.  The illegal investigation intentionally punished both Colonies and Mr. Burum for exercising their constitutionally-protected rights and chilled their ability to petition their government or make political contributions for fear of continuing and additional reprisals.

48.    The District Attorney's Office, already recognizing the political power that Colonies could wield, set out almost immediately to "investigate" Colonies and its partners, holding regular strategy meetings and engaging in inquiries about the settlement.   The District Attorney's Office had been conspiring with County officials in opposition to Colonies since at least 2005, when the public leak of a key confidential memorandum caused settlement negotiations (which, at the time, may have resolved the case in a manner far more favorably for the County) to cease.

49.    The District Attorney's Office also unleashed its investigators, whose previous dealings had justifiably earned them the nickname of the "Thug Squad." Defendants Randles and Schreiber repeatedly demonstrated the appropriateness of this nickname during the Colonies investigation.  During one interview, Defendant Randles exclaimed that he and the "Public Integrity Unit" were "elephant hunters … out for big game," leaving no doubt that his big game targets were Colonies and its partners, including Mr. Burum.  Instead of using legitimate interview techniques, these investigators bullied witnesses, put words in witnesses' mouths, and engaged in a scorched-earth mission to bring down Colonies no matter the cost.  One such witness, Dino DeFazio, recently had trumped-up perjury charges against him dismissed after they had been pending for eight years.  Mr. DeFazio's lone fault was telling the grand jury the truth, which was not what the "Thug Squad" wanted to hear.

50.    The entire structure of the District Attorney's Office's "Public Integrity Unit," led by Defendants Cope and Hackleman and overseen and

17

supervised by Defendant Ramos, directly contributed to the unlawful and unjustified violation of Colonies' constitutional rights. The District Attorney investigators and prosecutors were part of a single organizational unit with no true separation between the investigation and prosecution. Defendants Cope and Hackleman were directly involved in the botched and corrupt investigation, rather than remaining sufficiently separate to ensure its integrity and ultimately make independent charging decisions. This commingling of roles led to investigators and prosecutors failing to verify or corroborate false information obtained from Mr. Postmus, Defendant Aleman, Defendant Gonzales, and others. Prosecutors, investigators, and County witnesses with an axe to grind reinforced each other's passions and prejudices, feeding false information and unsubstantiated allegations into a self-deluding "echo chamber" through which the Defendants' prejudices against Colonies could take voice.

51.     Certain individuals in the District Attorney's Office actually revealed their motives on occasion. For example, in the Fall of 2008, Defendant Ramos told one elected official that he was "going to take some of the 'westside guys' down a few notches." Mr. Burum, several members of Colonies Partners, and the Colonies development are all situated in the western-most part of San Bernardino County. The elected official to whom Defendant Ramos spoke understood that Defendant Ramos was referring to Mr. Burum, Colonies, and those he perceived as their allies. And it was no coincidence that in this time period, Mr. Burum and Colonies were most politically active in terms of financial donations and high-profile public support for local candidates.

52.     In the same vein, Defendant Randles discovered that Colonies had worked with Mr. Erwin when exercising its First Amendment rights to petition the Board of Supervisors to approve the Settlement Agreement. Defendant Randles held a grudge against Mr. Erwin, as illustrated by a statement he made in 2008 that Mr. Erwin was in line to become Chief of Staff to Supervisor Neil Derry "unless

somebody can stop him." Defendant Randles also prepared a search warrant targeting Mr. Erwin in which he intentionally omitted the fact that Mr. Aleman—on whose representations the search warrant was based—had been charged with felony offenses amounting to perjury.

53.     And Defendant Randles's vendettas against both Colonies and Mr. Erwin escalated when he discovered that they were working together. On information and belief, the mere fact of their association further inflamed his desire for revenge. Despite (or perhaps because of) these obvious biases, Mr. Randles was named as "lead investigator" for the Colonies investigation and remained the lead investigator throughout the entire retaliation campaign.

54.     In November 2008, County Assistant Assessor Adam Aleman approached the District Attorney's Office seeking a deal. Defendant Aleman had already been caught engaging in misleading a grand jury, leading to felony charges of changing subpoenaed documents. Defendant Aleman's capacity for falsehood was further well-known to the investigation team by that point, as he had successfully misled County officials and the public about Mr. Postmus's condition and whereabouts while Mr. Postmus was County Assessor.

55.     The District Attorney's Office was eager to turn Defendant Aleman into an asset in the vendetta against Colonies, particularly Defendant Aleman's track record of being loose with the truth. They knew Defendant Aleman could be easily manipulated to tell the story they wanted to hear, and they easily manipulated him into doing so. Moreover, the investigative team attempted to have Defendant Aleman secretly record conversations in which he tried to trick Mr. Postmus into confirming their false allegations of bribery.

56.     But even this exercise soon became mired in fraud and cover-up. Defendants Randles and Schreiber became aware soon after their first meeting with Defendant Aleman that in his eagerness to join the conspiracy, he had already secretly taped a conversation with Mr. Postmus. This was a violation of California

law, as Defendant Aleman had not yet been authorized to record any conversations as an agent of the state.  Of course, Defendant Aleman already had enough legal trouble, so Defendants Randles and Schreiber went into full cover-up mode.  They both filed after-the-fact reports claiming to have given Defendant Aleman timely permission to record Mr. Postmus.  But they failed to coordinate their stories, and their separate reports told contradictory accounts of when and how Mr. Aleman was first authorized to secretly record Mr. Postmus.

57.     Defendants Randles and Schreiber's illegal actions were a direct result of their directive to obtain evidence against Colonies at all costs.  Even if their supervisors did not direct this specific illegal behavior, the evidence was documented in reports Defendants Randles and Schreiber created.  The investigation team either reviewed these reports, and thus knew (and ratified) or should have known that Defendants Randles and Schreiber were conducting their duties in an illegal fashion, or purposefully declined to review these reports because they did not want to interfere with Defendants Randles and Schreiber's illegal efforts to obtain false evidence against Colonies.

58.     Meanwhile, as the County continued its "investigation," Colonies and its managing partner, Mr. Burum, significantly increased their profile.  In April 2009, for example, Mr. Burum was being publicly identified as a person who had "built a powerful network that supports his causes."  One local political figure stated that Mr. Burum had "associates and organizations and political connections capable of providing power, behind political campaigns."  In 2007 and 2008, Colonies Partners gave $250,000 to a public safety union, which in turn contributed $400,000 to Neil Derry's successful campaign for a supervisorial seat.  Mr. Burum was publicly identified as someone with "a conglomerate of money and influence."

59.     Indeed, Mr. Burum "and his companies" were publicly credited in media reports with contributing more than $1.2 million to political action committees since 2003, and it was well known that Mr. Burum's (and Colonies')

20

interests ran to more than just local elections.  Mr. Burum, a prominent and outspoken Republican who supported Mitt Romney's presidential campaign in 2008, was expected to serve as the state fundraising chair for the 2010 Republican gubernatorial frontrunner, Meg Whitman.  Ms. Whitman's foreordained Democratic opponent, of course, was Defendant Brown, then serving as Attorney General.  Mr. Brown was on heightened alert that Colonies and Mr. Burum's involvement in promoting his future opponent posed an unwelcome threat to his political career.

60.    Then, in July 2009, San Bernardino County Supervisor Neil Derry issued a press release calling for an independent investigation into Defendant Ramos for "engaging in improper relationships with female subordinates and colleagues, along with other women."  Though he had stepped down prior to the issuance of the press release, Mr. Erwin had been Mr. Derry's chief of staff.  Mr. Derry's incendiary announcement kindled the District Attorney's Office's animus toward Mr. Erwin and Colonies, since Colonies was perceived as having indirectly donated hundreds of thousands of dollars to Mr. Derry's campaign.  Given these political circumstances, Defendant Ramos interpreted Mr. Derry's call for an investigation as a threat to his power and prestige, orchestrated by an elected official associated with Colonies, Mr. Burum, and Mr. Erwin.

61.    The very next day, the District Attorney's Office publicly announced its ongoing "investigation" into the Colonies settlement.  And it was no surprise that soon after, Defendant Ramos announced that Defendant Brown and the Attorney General's Office would assist the District Attorney's Office in the "ongoing probe into possible corruption involving the Colonies settlement."  Defendant Mandel was immediately assigned to the case.  Shortly thereafter, Defendant Mandel participated with Defendant Cope in a 2009 "investigative" grand jury convened to investigate matters related to Colonies and its partners.

62.    Meanwhile, Defendant Ramos made no secret of his animus toward Colonies, including Mr. Burum, making public statements about how his office had

come under attack from "very wealthy developers."  Defendant Ramos believed that the criminal investigation could be used to prevent Colonies, and Mr. Burum in particular, from becoming significant political foes in the next election, then just a year away.

63.   The combination of the forces of the Attorney General's Office and the District Attorney's Office was quickly followed in October 2009 by Defendant Brown's headliner appearance at a campaign fundraiser for Defendant Ramos in San Bernardino County.  Both Defendant Ramos and Defendant Brown were facing upcoming elections in 2010—Defendant Ramos for re-election as District Attorney and Defendant Brown for Governor of California.  Defendant Brown's appearance was all the more unusual because Defendant Ramos was registered as a partisan Republican, while Defendant Brown was running for office as a partisan Democrat. What united them was simply their mutual animus toward, and desire to take down, Colonies and their lead partners, especially Mr. Burum.

64.   The conspirators thus agreed to combine their forces to engage in the retaliatory investigation.  At the end of the day, while all of the various parties involved in the investigation may have entered the conspiracy with differing motives for retaliation, all of those motives merged into one overriding goal when the Defendants joined forces in August 2009:  Obtain revenge against Colonies for its litigation success and, at the same time, take Colonies and Mr. Burum off the political table as retaliation for supporting the Defendants' political opponents.

65.   Defendant Brown's retributive and punitive purpose for the investigation was evident from his own words in a communication directed to former State Senator James Brulte.  Mr. Brulte was warned by Defendant Brown, via intermediaries, to "Stay away from those 'Colonial' [sic] guys, because we are going to take them down."  Mr. Brulte understood the communicated message as a warning that if he did not want himself to become a target of the retaliatory investigation, Mr. Brulte should stop associating with Colonies and its partners, or

advocating for its interests, as he had done in the past.  Mr. Brown communicated this message through two intermediaries in a transparent attempt to maintain plausible deniability.

66.    Of course, Defendants were more than aware of Colonies' ability to employ the media and public opinion to tell its side of the story.  Colonies had been effectively using the media for years when having Mr. Burum take its message directly to the public.  The investigation team, led by Defendants Brown and Ramos, recognized that they could also use media and public relations to carry out their retaliatory campaign.

67.    Several months after the Attorney General's Office and the District Attorney's Office joined forces against Colonies, Defendants Ramos and Brown held a joint press conference to announce the prosecution of Mr. Postmus and Mr. Erwin in what they were already calling potentially the largest public corruption scandal in the history of California.  Defendant Brown claimed that it was the "most appalling corruption case in decades" and "a shocking example of how money can corrupt the government process"—statements made as though they were proven facts, even as Defendant Brown was collecting record amounts of campaign cash for his own race for California Governor.  Defendant Ramos noted that two Colonies partners (neither identified at the time, but in truth Mr. Burum and his co-managing partner, Dan Richards) had been named as unindicted co-conspirators at the time, and warned about an "ongoing investigation."  Defendant Ramos then decried—again stated as though a proven fact—"a well-orchestrated political and personal attack on this District Attorney, attempting to intimidate me in obstructing justice and finishing this job."  Defendant Ramos, recognizing that Colonies remained a threat to his power, declared that he was going to "finish the job" by aggressively investigating Colonies and its partners, including Mr. Burum.

68.    Defendant Ramos assured the public that Defendant Brown was his "crime-fighting partner," and that both were responsible for the investigation.

Defendant Ramos explained that the Attorney General's Office "went through all of our evidence, and now have worked with us every day on this."  Defendant Ramos expressly named Defendants Hackleman, Schons, and Mandel, and explained that they were "working together every day" on the investigation.

69.     The same day as the press conference, the Office of the Attorney General released a statement regarding the ongoing investigation.  In that statement, Defendant Ramos was quoted as stating "[t]he assistance of the Attorney General's Office has been, and will continue to be, invaluable *in our investigation*.  I would like to thank Attorney General Brown for providing the excellent assistance of Deputy Attorney General Melissa Mandel *who has been working directly with our team* and Senior Assistant Attorney General Gary Schons *for his advice and direction over the past months*."

70.     While Colonies and its partners remained unindicted at that time, Defendants Brown and Ramos both made it clear that they were the real target in the ongoing criminal investigation.  Defendant Ramos lamented that Colonies had obtained compensation for its property in "these tough economic times," and explained that his goal was to "get that money back to the citizens," a statement he repeated innumerable times at various political and fund-raising events throughout the Colonies investigation, and the eventual prosecution.  Defendant Ramos further claimed that these "well-funded folks, developers" were somehow trying to "attack and control the D.A's office for exposing this corruption."  The subtext was that that the investigation was punishment against Colonies' all-too-successful campaign to lawfully influence the political process.  The truth was the precise opposite:  Defendant Ramos was on the attack against Colonies and Mr. Burum, using the media and the power of his political office to advance Defendants' orchestrated campaign of retaliation.

71.     Defendant Ramos did not even bother to hide his intent to squelch Colonies' First Amendment rights.  Just a week after the February 10 press

conference, Defendant Ramos explained that "these people"—a not-very-thinly veiled reference to Colonies and its partners—wanted to "take [him] out" for "political reasons."  He then issued the clear threat that he would "watch where every dime (of campaign spending) came from."  The message was not lost even on Defendant Ramos's opponent at the time, who accurately summarized Defendant Ramos's statement as a threat to criminally prosecute anyone that offered financial support to Mr. Ramos's opposition

72.     And even after Mr. Burum was acquitted, Mr. Ramos continued to demonstrate his obsession with revenge and retaliation for the Colonies settlement. In 2018, referring to Mr. Burum as an "Upland developer," Mr. Ramos made various statements suggesting that his political and financial support for Mr. Ramos's opponent for the office of District Attorney, Jason Anderson, was unethical and illegal.  In another statement, Defendant Ramos called legal contributions by Mr. Burum and others to certain legal political action committees "money laundering," another threat again designed to chill political speech by Mr. Burum and his associates, including Colonies and its partners.

73.     Defendant Brown demonstrated similar animus against Colonies in his own public statements, stating that he found it significant that there was "$102 million being voted on," and explaining that the settlement would be "void" and the $102 million would be paid back to the County by Colonies.  Defendant Brown demonstrated his willingness to direct the investigation based on a preordained assumption of guilt, stating that there was "no basis" for the $102 million settlement.  Instead, he claimed that without "illicit, improper, and corrupt influencing . . . then the taxpayers would have never paid anywhere near—if anything—into this settlement."

74.     These statements were provably false, and maliciously made.  At the same time Defendant Brown was making this statement, he knew (as did Defendants Ramos, Mandel, Cope, Schons, Hackleman, and the other members of

the investigation team) that the supposed victim, the County of San Bernardino, was appearing in court to substantively *defend* the $102 million settlement on the basis that if the settlement had not been reached, the County's damages would have increased to $300 million or more.  The investigation team also knew that Judge Warner had publicly urged the parties to settle, telling them in open court that "resolution is preferred over continued litigation in this matter."  But Defendant Brown and the other Defendants that participated in the retaliatory investigation had no interest in the actual facts of the case or a fair investigation.

75.     In fact, Defendants knew that multiple County lawyers had cleared the settlement, having been told in 2009 by San Bernardino County Counsel Mitchell Norton that "the district's outside counsel, another 18 set of lawyers, in connection with my office, have engaged expert witnesses in various disciplines and are prepared to try the case that the settlement was objectively reasonable given the circumstances at the time."  Mr. Norton added that the County's legal team in 2009 was "confident that it can demonstrate that the exposure at the time of the settlement was real."  Having taken the reins of the investigation, Defendant Brown had this information but, like the rest of the investigation team, turned a blind eye to the truth.

76.     To make these statements, Defendant Brown and the investigation team also had to set aside that the San Bernardino County Superior Court had conclusively held that the Settlement Agreement was legal and valid following a validation action *brought by the County* and supported by a unanimous Board of Supervisors—a holding subsequently upheld by the Court of Appeal in dismissing a 2012 lawsuit brought by taxpayer groups seeking to challenge and invalidate the settlement (the "Taxpayer Action").

77.     Defendant Brown was entirely indifferent to the facts, and both he and Defendant Ramos set the investigation team on a course that encouraged investigation by any means, so long as those means resulted in retribution.

78.     Meanwhile, Defendants Brown and Defendant Ramos's directive that the settlement amount be deemed unjustified and, thus, had to be a product of corruption, became a mantra among those participating in the investigation.  In a March 17, 2010 letter to San Bernardino County, Defendant Schons wrote that "relevant to the charge that the settlement was a product of corruption is the fact that 'the settlement amount was neither justified nor properly and thoroughly vetted before it was voted on and approved.'"  Again, Defendant Schons knew this was not the case because the County was taking a contrary position in civil litigation, complete with expert witnesses testifying that $300 million was an accurate level of damages.  In the same letter, Defendant Schons repeatedly made reference to the investigation team and its ongoing "investigation" into supposed corruption.

79.     The March 17 letter (and others like it) was Defendant Schons' effort to assist Defendants Hackleman and Stringer to pursue a fundamentally dishonest "two paths" strategy, documented in written correspondence discovered during the criminal prosecution.  The purpose of the "two paths" strategy was to permit the County to defend the legality of the settlement in its civil litigation, while prosecutors would simultaneously try to prove its criminality as part of criminal investigation.  In their view, this strategy would permit the County—the supposed victim in the alleged "crime" being investigated—to defend the very settlement that Defendants had prejudged as unreasonable and corrupt.  On information and belief, they reasoned that by pursuing both paths, at least one of them would succeed in punishing Colonies.  Defendant Stringer even violated her ethical duties in her zeal to punish Colonies and Mr. Burum by sharing attorney-client privileged information with Defendant Hackleman *before* the Board of Supervisors voted to waive the privilege.

80.     Further evidencing their retaliatory animus, Defendants Brown and Ramos ordered the investigation team to interview dozens of witnesses sympathetic to the County's interests.  These witnesses, all angry at Colonies for obtaining the

27

settlement, insinuated—falsely, of course—that the settlement must have been the result of corruption.  Defendants sought out these witnesses with a vendetta against Colonies because that vendetta matched their own.

81.    Moreover, the investigation team continued to employ Defendants Randles and Schreiber to conduct the investigation, even after the Attorney General's Office joined the investigation, because the team knew that Defendants Randles and Schreiber would use their usual aggressive and coercive tactics to manufacture supposed "evidence."  To this end, any witness that dissented from the investigation's pre-ordained path was bullied, threatened, and isolated in attempts to obtain false testimony.

82.    For example, Matt Brown was Mr. Biane's Chief of Staff at the time of the Colonies settlement and subsequent PAC contributions.  Defendants intimidated Mr. Brown into wearing a wire and making secret recordings of his conversations with Mr. Biane, Mr. Postmus, and others.  Although Mr. Brown recorded dozens of conversations with men who knew and trusted him in 2009 and 2010, none of these recordings revealed the slightest evidence of corruption or bribery.  To the contrary, Mr. Brown recorded Mr. Postmus stating that there was no bribe.  And though Mr. Brown was a cooperating witness, he would not admit that there was a *quid pro quo*.  This glaring absence of evidence did not dissuade the investigation team in the slightest.

83.    While Defendants Randles and Schreiber were undertaking all of these aggressive and intimidating actions to supposedly obtain evidence against Colonies, one thing they were not doing was actually looking at any documents or interviewing any witnesses that might actually exonerate Colonies and its partners.  On information and belief, Defendants Randles and Schreiber were directed by their supervisors—Defendants Brown, Ramos, Schons, Mandel, and Cope—to accept that the settlement could never be justified on the merits, and to ignore gathering, reviewing, or considering evidence contradicting that point.  Defendants

28

Randles and Schreiber therefore ignored information that the settlement could be reasonable, as it would have been self-defeating to the investigation's primary purpose as stated by Defendants Brown and Ramos—take down Colonies and its partners.

84.     At this point in the investigation, the Defendants were relying on biased County-related witnesses offering uninformed opinions diametrically opposed to the County's current legal position, combined with the information provided by Defendant Aleman, an accused perjurer and all-around liar.  They recognized they needed more evidence to hide the true retaliatory nature of their investigation.

85.     It was for this reason that Mr. Postmus's testimony was so important to the investigation team, and why Mr. Postmus was coerced into giving false testimony and his drug addiction leveraged to manipulate his memory.  Mr. Postmus was one of the Supervisors who voted in favor of the Settlement Agreement.  He was also affiliated with at least one of the political action committees that received political contributions from Colonies in 2007.  The investigation team needed someone to tie these two events together to build their case of bribery against Colonies and Mr. Burum, and they knew that Mr. Postmus was someone who could be manipulated because of his ongoing and longstanding methamphetamine addiction and the numerous felony charges he faced based on his drug use and illegal conduct in the Assessor's Office.

86.     Mr. Postmus had left the Board of Supervisors after being elected to the position of County Assessor in January 2007.  As he has since admitted, he was battling severe drug addiction at that time, and the impact of that drug use soon became apparent, especially to trained law enforcement officials.  By January 2011, Mr. Postmus had been forced to resign as Assessor and was facing numerous felony charges for actions unrelated to Colonies.  He was even arrested in court for making an appearance under the influence of methamphetamine.

87.     Defendants Randles and Schreiber knew all of this because of their involvement in ongoing criminal investigations against Mr. Postmus.  Defendant Randles, in particular, had bragged about how he had "studied" Mr. Postmus and knew him well.  And because the seasoned investigative team knew full well how Mr. Postmus's methamphetamine abuse could impact memory—among other things, making him more susceptible to having false memories implanted by coercive questioning—the team recognized and seized the opportunity to manipulate Mr. Postmus into becoming their star witness for their campaign of retaliation and retribution.  To Mr. Postmus (and several others as well), Defendants Randles and Schreiber would claim that they "knew all the answers" before ever hearing from the witness.  Indeed, these statements simply echo the prejudgment of guilt, and nakedly retributive purpose, that inevitably drove the entire investigation.

88.     The investigation team went so far as to avoid drug testing Mr. Postmus during the investigation, giving Defendants Cope and Mandel plausible deniability when they eventually elicited false testimony from Mr. Postmus before the indicting grand jury in which he claimed to have been sober for months (only to later admit that he had been using methamphetamine throughout his cooperation with the District Attorney's Office and his grand jury testimony).  Of course, failing to drug test Mr. Postmus had the added benefit to Defendants Randles and Schreiber of increasing the likelihood that Mr. Postmus would continue his methamphetamine abuse and thus remain in the drug-addled state they needed to continue manipulating him.  Defendants Cope and Mandel, who directly oversaw the conduct of Mr. Postmus's interviews, were aware of and endorsed these strategies, knowing the importance of Mr. Postmus's answers.

89.     Defendants recognized that by working together with textbook carrot-and-stick manipulation, they could convince Mr. Postmus to offer the false testimony they needed to politically checkmate Mr. Burum and Colonies.  And it worked.  Over the course of five interviews in early 2011, Defendants Randles and

Schreiber—aided by Defendants Cope and Mandel—repeatedly and successfully manipulated Mr. Postmus's memory and coerced him into saying what they wanted to hear.

90.     Multiple Defendants took a hands-on approach to Mr. Postmus's interviews.  Defendant Cope attended Mr. Postmus's first interview, and introduced Defendants Randles and Schreiber, stating that "I have these folks [meaning Defendants Randles and Schreiber] and they're professionals."  But in his initial interviews with Defendants Randles and Schreiber, Mr. Postmus explicitly and repeatedly denied that he had ever accepted a bribe in exchange for his pro-settlement vote.  And he emphatically stated that Mr. Burum had "never crossed the line" with him in dealing with the Colonies matter.  On information and belief, Defendants refused to accept this truth because it did not further the retributive narrative against Colonies created by Defendants Brown and Ramos: that the only explanation for the $102 million settlement was corruption.

91.     Defendant Mandel attended a later interview with Mr. Postmus, with Defendant Cope explaining that "she's part of this case and so she's gonna be here for just a [inaudible]."  Defendant Mandel had looked over transcripts of "some of [Mr. Postmus's previous] interviews," and was clearly concerned because they tended to emphasize Mr. Postmus's repeated denials of a corrupt *quid pro quo* agreement.  Defendant Mandel thus coached Mr. Postmus on how he should deliver his answers so that he could be of maximum use to the investigators.  Defendant Mandel made the investigatory purpose of her presence clear, requesting "bank records, phone records, text messages, phone messages, [and] emails" for use in the investigation.  At no point did Defendant Mandel mention the upcoming grand jury. Defendants Randles and Schreiber then set up yet another investigatory interview to continue grooming Mr. Postmus to testify as they wanted him to testify.

92.     Defendants Randles and Schreiber also planted smaller deceptions for the purpose of manipulating Mr. Postmus into telling larger lies.  For example, they

31

convinced Mr. Postmus during their interviews that he had fired the County's outside counsel in 2004 at Mr. Burum's insistence.  But they knew that could not be true, as Mr. Postmus had already told them he did not get to know Mr. Burum until a trip to China over a year later.  Indeed, it eventually became part of the prosecution's narrative to claim that Mr. Burum had arranged to go on the 2005 China trip for the precise purpose of meeting Mr. Postmus and discussing Colonies with him.  Of course, even that premise was easily disproven by an objective investigation, which would have found that Mr. Postmus had been invited to go on that China trip a year earlier for reasons entirely unrelated to Mr. Burum.  Mr. Postmus later recognized and admitted that his contradictory and nonsensical "memories" of these events had been planted by an unscrupulous and coercive investigation team.  The result was that Defendants Randles and Schreiber elicited and even fabricated false information to fulfill their mandate to obtain evidence to be used in retaliating against Colonies at all costs.

### **Other Conspirators in the Unlawful Retaliation**

93.    Other current and former County employees instigated and championed the retaliatory investigation.  On information and belief, at least two—Defendants Gonzales and Aleman—conspired with the other Defendants to retaliate against Colonies and Mr. Burum for exercising their constitutional rights.  Among other things, Defendants Gonzales and Aleman helped initiate the wrongful investigation and the eventual prosecution of Mr. Burum by providing false statements to District Attorney investigators, and then agreed to repeat those false statements in perjurious testimony before the grand juries and criminal trial jury.

94.    On information and belief, Defendant Gonzales helped initiate the investigation by making a false report in late 2006 or early 2007 to the District Attorney's Office, apparently claiming that the Settlement Agreement was procured by corruption.  Of course, Defendant Gonzales had no actual evidence of corruption to report; rather, on information and belief, she was motivated to avoid political

fallout from the size of the settlement and to appease some of her largest financial backers who were rival land developers of Colonies and Mr. Burum.

95.     Beginning in 2008, Defendant Gonzales volunteered other false information to District Attorney investigators and the 2009 investigative grand jury, including that Mr. Burum had supposedly intimidated her in the run-up to the 2006 settlement.  For example, Defendant Gonzales falsely claimed that Mr. Burum menaced her in China prior to the settlement, to the point that she feared he was going to kidnap, drug, and take compromising photographs of her.  Supposedly the purpose of all this was to intimidate or extort her into voting for the Settlement Agreement.  This was fantasy:  Defendant Gonzales and Mr. Burum were never in China at the same time.

96.     On information and belief, Defendant Gonzales entered into an agreement with one or more of the other Defendants to make false statements and provide perjurious testimony as part of the conspiracy to retaliate against Colonies and Mr. Burum for having exercised their First and Fifth Amendment rights. Defendant Gonzales was motivated to conspire with other Defendants and make these false statements by her desire to punish Colonies and Mr. Burum for vindicating their First and Fifth Amendment rights to approach the government and seek fair compensation in the civil litigation with the County and District, for successfully petitioning the government in connection with the Settlement Agreement, and for making political contributions to PACs associated with Defendant Gonzales's political rivals.  She was further upset by Mr. Burum's public advocacy for Colonies' interests and his highly personal criticisms of her, the Board of Supervisors, and County staff.

97.     Defendant Aleman also conspired with one or more of the other Defendants to initiate the wrongful investigation.  Beginning in 2008, Defendant Aleman started supplying the investigative team with knowingly false information to initiate and encourage the criminal investigation against Colonies and Mr.

33

Burum.  At the time, Defendant Aleman himself was under investigation for various criminal conduct in the County Assessor's Office.  As Defendant Aleman has since admitted, he had lied about Mr. Postmus's drug use and sexuality, used campaign accounts as his own personal slush fund, physically destroyed County equipment to cover up his and Mr. Postmus's misdeeds, altered public documents sought by the civil grand jury in their investigation of the Assessor's Office, and lied under oath to that grand jury.

98.     Seeking to obtain a favorable plea deal, Defendant Aleman claimed he had information about other criminal conduct in the County.  Under questioning by Defendants Randles and Schreiber, Defendant Aleman at first truthfully reported that he had very little information about the Colonies settlement and knew nothing of any crimes in that context.  But when it became clear that investigators were willing to ignore Defendant Aleman's wrongdoing in return for his cooperation in the retaliation scheme, Defendant Aleman began to exaggerate his role in the settlement negotiations and to fabricate claims of bribery and corruption.  He did this because he knew investigators and prosecutors were focused on punishing Colonies and Mr. Burum for the Settlement Agreement and PAC contributions, and joining the conspiracy against Colonies and Mr. Burum was the best way to avoid consequences for his own illegal actions.

99.     As described above, it was at the invitation of Defendants Randles and Schreiber—on information and belief, supervised by Defendants Ramos, Cope, Hackleman, Brown, Mandel, and/or Schons—Defendant Aleman began "developing" evidence against Mr. Postmus and Mr. Burum.  In text messages and secretly recorded conversations, Defendant Aleman began feeding Mr. Postmus the false narrative that Mr. Burum had bribed Mr. Postmus on behalf of Colonies. Defendant Aleman knew more than anyone else how drug-addled and vulnerable Mr. Postmus was, and how susceptible his memory was to accepting this confabulation as the truth.  Defendant Aleman also began to tell investigators he

34

had firsthand information that Colonies and Mr. Burum made the 2007 PAC contributions in a *quid pro quo* exchange for Mr. Postmus's vote.

100.   For example, Defendant Aleman invented meetings between Mr. Postmus and Mr. Burum in 2006 during which the corrupt agreement was supposedly struck and at which Defendant Aleman claimed to be present.  The meetings were entirely imaginary.  Defendant Aleman even placed some of these meetings at the Red Hill Country Club's clubhouse at a time when it did not exist (having been demolished to make way for a new clubhouse), a fact that was readily discoverable had Defendants bothered to engage in objective investigation instead of blindly pursuing their efforts to retaliate against Colonies and Mr. Burum. Despite these obvious lies, prosecutors advocated in Defendant Aleman's subsequent sentencing hearing that he had told the truth, and urged leniency for his crimes.  Thus, just as he had hoped, Defendants Ramos, Cope, Mandel, and others ultimately allowed Defendant Aleman to walk away with little more than a slap on the wrist in appreciation for cooperating with the scheme.

101.   On information and belief, Defendant Aleman entered into an agreement with one or more of the other Defendants to make these false statements and provide perjurious testimony as part of the conspiracy to retaliate against Colonies and Mr. Burum for having exercised their First and Fifth Amendment rights.

102.   Another member of the conspiracy to illegally retaliate against Colonies and Mr. Burum was Defendant Stringer, the San Bernardino County Counsel at the time of the Settlement Agreement and throughout much of the criminal investigation.  In 2010 (if not earlier), Defendant Stringer began cooperating and conspiring with Defendant Hackleman, Defendants Schons, and the District Attorney's Office in the retaliation campaign.  Among other things, Defendant Stringer:

a)     Met with prosecutors regarding their suggestion to "move towards the filing of a GC1092 [Government Code § 1092] action to recover the $102M";

b)     Voluntarily met with prosecutors at least a dozen times in 2010 to assist with their investigation and prosecution of Mr. Burum;

c)     Voluntarily provided feedback to prosecutors on the felony complaint attacking the Settlement Agreement and its legality;

d)     Signed a voluntary waiver of the attorney-client privilege and the mediation privilege on behalf of the County as to "any request by the prosecutors to produce or examine any documents maintained by the County" or to interview witnesses;

e)     Provided attorney-client privileged information to investigators even before the attorney-client privilege was waived by the County; and

f)     Voluntarily met with prosecutors at least an additional two dozen times in 2011, prior to Mr. Burum's indictment, to assist them in developing the false narrative that the Settlement Agreement was unreasonable and illegal.

103.    Defendant Hackleman expressly told Defendant Stringer that it was the District Attorney's goal to "be prepared to show that [the settlement] was unreasonable" even though the County was simultaneously defending the reasonableness of the settlement in its indemnity litigation in court and in its insurance arbitrations. With no little understatement, Defendant Hackleman explained that it would be "an epic challenge" to gather information to support the exact opposite position as the position the County was already taking in litigation. Defendants Schons participated in and endorsed these efforts to manipulate the investigation in this fashion.

104.    On information and belief, Defendant Stringer entered into an agreement with one or more of the other Defendants to continue providing

36

assistance in pursuing the illegal Colonies investigation as part of the conspiracy to retaliate against Colonies and Mr. Burum for having exercised their First and Fifth Amendment rights.

105.   In 2011, Defendant Ramos held yet another press conference after Mr. Burum, Mr. Kirk, Mr. Erwin, and Mr. Biane were indicted and arrested.  During that press conference, Defendant Ramos quoted Defendant Mandel as calling the prosecution team "Team Justice," a pretext in the ongoing battle to win public support for the retaliation scheme.  Defendant Ramos identified "Team Justice" as including Defendant Cope, Defendant Randles, Defendant Schreiber, Defendant Hackleman, Deputy District Attorney Michael Smith, Deputy District Attorney John Goritz, Defendants Schons, Mandel, Brown, and others.  Defendant Ramos claimed that the team "worked hard" together and uncovered a "significant amount of evidence."  He claimed that "Team Justice" had gathered dozens of witnesses. He claimed that Mr. Postmus's guilty plea supported what "Team Justice . . . already knew":  The Colonies defendants were guilty.  Defendant Ramos's conduct in this matter demonstrates that when he exclaimed that "corruption would not be tolerated in San Bernardino County," what he really meant was that "Colonies would not be tolerated in San Bernardino County."

106.   During the 2011 press conference, Defendant Ramos again brought up the $102 million settlement payment, and explained that "Team Justice" was going to seek an order of restitution requiring Colonies to return the settlement payment— even though the District had already received 72 acres of Colonies' developable land for regional flood control use.  Defendants, angry that the District had been forced to compensate Colonies for that land, used the pretext of the prosecution to pressure Colonies to disgorge its hard-won compensation guaranteed under the Fifth Amendment.  Indeed, Defendant Ramos explained during the press conference that the District Attorney's Office was also "partners" with the San Bernardino County Counsel's office in their efforts to recover the $102 million,

37

leaving no doubt about the County's and Defendant Ramos's complicity in their joint retaliation scheme and that Colonies was their target.  Defendant Schons also spoke at the press conference on behalf of the California Attorney General's Office. Defendant Schons emphasized the "equal partnership" shared between the District Attorney's Office and the Attorney General's Office in investigating the case.

**Presentation of False Testimony and Evidence**

107.   Defendants Cope and Mandel—on information and belief, supervised by Defendants Ramos, and/or Brown—presented fraudulent evidence to an investigative grand jury in 2009 and the indicting grand jury in 2011 to secure Mr. Burum's indictment on false charges and without probable cause.  Among other things, they presented Mr. Postmus's, Defendant Aleman's, and Defendant Gonzales's false testimony discussed above.  They also pressured other witnesses, including Mr. Brown, to give false testimony.  And Defendant Randles testified falsely about the timing of his investigation in order to prevent certain charges from being barred due to the statute of limitations.

108.   Defendants Cope and Mandel—on information and belief, supervised by Defendants Ramos—also manipulated the grand jury process to hide exculpatory evidence.  For example, they presented evidence that Judge Warner and others had been the subject of a judicial ethics investigation due to alleged inappropriate contacts with Mr. Burum, knowing that the instigator of that investigation—James Lindley—had recanted his allegations.  Mr. Lindley was a County employee who had claimed in 2006 that he had information that one of the judges for the civil case (either Judge Norell or Judge Warner) was golfing buddies with Mr. Burum—with the clear implication being that this improper relationship impacted the case.  Defendants Cope and Mandel presented this accusation to the indicting grand jury through testimony from former County Counsel Dennis Wagner, without informing the grand jury at that time that Mr. Lindley had recanted his claim.  Then, in what they admitted was a highly unusual move, they

38

called Mr. Lindley to testify in front of a separate civil grand jury at the same time that the criminal grand jury was sitting.  During his testimony, Mr. Lindley candidly admitted that he had no basis for the damaging accusation and had presented it to his superiors to inflate his reputation.  But because the prosecution manipulated the grand jury process, the indicting grand jury did not get to hear Mr. Lindley's rueful recantation.  Instead, Defendants Cope and Mandel waited until the very end of the grand jury process to present a secondhand, sanitized version of Mr. Lindley's admissions.  This allowed them to present the rumor to the grand jury as further "evidence" of corruption, while hiding for as long as possible the fact that Mr. Lindley's account was wholly fictitious, and depriving the grand jury of the opportunity to evaluate Mr. Lindley's credibility or ask him any questions of their own.  This strategy paid off, as grand jurors openly wondered—without any basis in reality—whether "Judge Warner was in Jeff Burum's pocket financially or otherwise."

109.   Defendants Cope and Mandel—on information and belief, supervised by Defendant Ramos—also presented other "evidence" to the grand jury that unfairly impugned the reputation of retired California Supreme Court Justice Edward Panelli, who had served as mediator in the Colonies civil case.  They introduced testimony from Defendant Gonzales claiming that she saw Mr. Burum talking to Justice Panelli after a mediation session and supposedly giving him a ride in Mr. Burum's car, and that she knew that this encounter was "extremely wrong" and perhaps "extremely illegal."  Defendants Cope and Mandel also asked a witness hypothetically—without presenting any evidence—if he would have had concerns if Justice Panelli had accepted a plane ride from Mr. Burum.  They elicited this testimony despite having no basis to believe that Justice Panelli had engaged in any impropriety.  Indeed, as a mediator, Justice Panelli had no decision-making authority over the civil case, so this "evidence" had no relevance to the bribery allegations.

39

110.   On information and belief, Defendants Cope and Mandel—supervised by Defendant Ramos—introduced these allegations regarding Judge Warner, Judge Norell, and Justice Panelli in order to create an aura of corruption over the entire civil case, to hint at additional acts of uncharged and unproven crimes by Mr. Burum and others, and to cast doubt over the reasonable—and legal—basis for the Settlement Agreement.  In this manner, they implied and ultimately argued, without evidence, that the only possible reason for the Settlement Agreement was bribery and corruption.

111.   As a result of the Defendants' fraud, perjury, threats, lies, and sham investigation, the 2011 grand jury indicted Mr. Burum on seven felony charges.  The 2011 grand jury's findings were the first probable cause finding against Mr. Burum—prior to the 2011 grand jury, Defendants had not so much as obtained or served a search warrant against Colonies or Mr. Burum.

112.   The criminal trial that eventually followed only served to further expose that the Colonies investigation had not been a legitimate attempt to uncover the truth, but instead a retaliation campaign.  The following are only some of the examples of testimony and evidence elicited by the prosecution at trial that backfired, exposing the fraudulent and retaliatory nature of the Colonies investigation:

    a)   Defendant Randles again claimed, as he had before the indicting grand jury, that prior to his November 1, 2008 interview of Defendant Aleman, he did not know who Mr. Burum was, a highly material allegation relevant to the delayed discovery exception rule to the statute of limitations.  On cross-examination, Defendant Randles's own words exposed his claim as a lie.  Indeed, tapes of Defendant Randles discussing Mr. Burum in earlier 2008 interviews were played in the courtroom.

b)  Defendant Gonzales told the trial jury that Mr. Burum was lurking in China in 2005 for the purpose of taking advantage of her and intimidating her into voting for the Settlement Agreement. On cross-examination, it was proven that Defendant Gonzales was not in China in 2005—she was at various well-publicized events in San Bernardino and Louisiana. Defendant Gonzales then changed her story, under oath, and claimed it was in 2006 that she saw Mr. Burum in China. But Mr. Burum was not in China during that 2006 trip. He was in Palm Springs at the wedding of his business partner's daughter. When confronted with Mr. Burum's passport, which established that Mr. Burum did not go to China in 2006, Defendant Gonzales stubbornly refused to admit her lies, instead claiming that he could have flown into Communist China on a private jet and evaded customs. Defendant Gonzales also testified that she had a long record of voting against the Colonies settlement, which was entirely contradicted by her actual voting record of voting in favor of settlement at every opportunity until the very end. At no point during several days of this contradictory, fabricated, and outlandish testimony did prosecutors attempt to prevent or correct this perjury from their own witness; instead, they continued to elicit it and doubled down in redirect examination.

c)  Defendant Aleman testified on direct examination that Mr. Postmus only became involved in the Colonies litigation after a trip to China in September 2005 that both Mr. Postmus and Mr. Burum attended. This was false, as Defendant Aleman conceded under cross-examination. Defendant Aleman also claimed that he attended several meetings at the Red Hill Country Club clubhouse in 2006 in which Mr. Postmus and Mr. Burum supposedly discussed the alleged bribe. But the

41

1    evidence showed that there was no Red Hill Country Club clubhouse

2    in that period; it had been torn down and was being rebuilt—a fact

3    anyone could have discovered with little investigation.  Defendant

4    Aleman lied about the locations of other supposed meetings as well,

5    with cross-examination exposing that he had told different stories at

6    different times.

7    d)    Defendant Mandel also helped Defendant Aleman cover up his illegal

8    receipt of campaign funds.  When initially asked about having

9    obtained personal reimbursement for a political event, Defendant

10   Aleman denied having ever done so.  Defense counsel then confronted

11   Defendant Aleman with public records evidencing that he received an

12   unlawful personal reimbursement for campaign expenditures.  Defense

13   counsel eventually forced Defendant Aleman to admit that he had lied

14   about receiving these funds.  Nevertheless, on redirect examination,

15   Defendant Mandel attempted to rehabilitate Defendant Aleman's

16   credibility.  She elicited further perjurious testimony from Defendant

17   Aleman that he had not unlawfully received campaign funds, which

18   was contradicted by the documentary evidence she—and everyone in

19   the courtroom—had just viewed.  Defendant Mandel also asked

20   questions designed to whitewash Defendant Aleman's embezzlement

21   and dishonesty by eliciting testimony that reimbursement from

22   campaign funds was routine and legal—although they were nothing of

23   the sort in this instance.  In doing so, Defendant Mandel tried to hide

24   Defendant Aleman's theft, hide his lies about the theft, and knowingly

25   suborned perjury.

26   e)    Defendants Randles and Schreiber became aware soon after first

27   meeting with Defendant Aleman that he had secretly taped a

28   conversation with Mr. Postmus, a violation of California law because

1    he had not yet been authorized to record as an agent of the state.

2    Defendant Aleman admitted that he lied on the stand when he initially

3    claimed he had authority to make the recordings.  But Defendant

4    Randles nevertheless insisted that Defendant Aleman had been

5    authorized.  On cross-examination, it was shown that Defendants

6    Randles and Schreiber had conspired to provide Defendant Aleman

7    with a cover story—but they failed to coordinate their stories, filing

8    separate police reports with entirely different accounts of when and

9    how Defendant Aleman was first authorized to secretly record Mr.

10   Postmus.

11   f)   Mr. Postmus falsely testified on direct examination that he had been

12        bribed by Mr. Burum.  Defendants Cope and Mandel—on information

13        and belief, supervised by Defendant Ramos—allowed this testimony

14        despite the fact that Mr. Postmus had repeatedly told their investigators

15        that there was no *quid pro quo* agreement to accept a bribe in exchange

16        for a pro-settlement vote, and that Mr. Burum had never "crossed the

17        line" to obtain the Settlement Agreement.  On cross-examination, Mr.

18        Postmus was shown how Defendants Randles and Schreiber had

19        bullied and manipulated him into "confessing" to crimes that never

20        occurred.  After recognizing how he had been taken advantage of, Mr.

21        Postmus testified on cross-examination that he was "100% positive"

22        no bribery had occurred, and reaffirmed that Mr. Burum had "never

23        crossed the line" in advocating for the Colonies settlement.

24   g)   Mr. Postmus also testified on direct examination that Mr. Burum had

25        engineered Mr. Postmus's attendance on a 2005 trip to China, which

26        prosecutors argued was an effort to "groom" him to accept bribes.  In

27        reality, and as confirmed by documents in the prosecution's

28

possession, Mr. Postmus had been invited by an unrelated third party a year earlier.

113.   In short, cross-examination revealed the prosecution's "evidence" to be pure farce.  Indeed, after six months of impeaching every prosecution witness on multiple points, Mr. Burum rested his defense case without calling a single witness. And it took only two days of deliberation for the jury to acquit Mr. Burum on all remaining charges on August 28, 2017, after Judge Smith had already dismissed a number of counts for either legal deficiency or failure to present evidence to support them.

114.   Interviewed after their verdict, members of Mr. Burum's jury made no secret of their outrage at the waste of taxpayer dollars and the evident incompetence and fraud they witnessed for so many months.  Indeed, they wondered—among other things—why prosecutors had presented obviously false testimony and why Defendants Randles and Gonzales were not facing prosecution for perjury.   One juror expressed that prosecutors "lacked any type of grounds to prosecute." Another juror expressed that Defendant Aleman was untrustworthy and not credible, and "never" should have been on the witness stand.  A third, wondering why the trial took several months, suggested that if there had been proof of guilt, the prosecution should have "shown that right away."

115.   The answer, of course, is that none of the Defendants had any interest in pursuing justice.  The entire exercise was a pure act of retaliation against Colonies and Mr. Burum for exercising their First and Fifth Amendment rights. Judge Warner was absolutely correct when he stated in a September 6, 2017 newspaper op-ed that the criminal trial was a "travesty" which "should never have occurred."  And though Colonies and Mr. Burum were finally vindicated, it was at the cost of millions of dollars and irreparable damage to their public reputations.

116.   Sadly, but not surprisingly, Defendant Ramos has not let up even after the public humiliation he suffered in the Colonies trial.  When Mr. Burum and

44

others made campaign contributions to political committees supporting Defendant Ramos's current opponent in the upcoming election for District Attorney, Defendant Ramos again started making threats of retribution, publicly claiming that these legal and fully-disclosed political contributions constituted "money laundering."  Defendant Ramos's efforts to chill First Amendment activity thus continue unabated.

## FIRST CLAIM

### Retaliation – 42 U.S.C. § 1983

### Against Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Mandel, and Schons

117.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 116 of this Complaint as though fully set forth herein.

118.   Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Mandel, and Schons, all state actors or acting under color of state law, had a duty to permit Mr. Burum free exercise of his constitutional rights.

119.   When Mr. Burum exercised these rights, as set forth above, Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Mandel, and Schons retaliated against Mr. Burum in the manner alleged herein for participation in what Defendants knew were First and Fifth Amendment protected activities. These Defendants' retaliatory conduct included, but was not limited to, the following:

a)   Initiating a fraudulent and illegitimate criminal investigation into Colonies and its management, in particular, Mr. Burum;

b)   Publicly threatening to use the criminal investigation as a means to take back the $102 million Colonies had received as just compensation for the County and District's taking of its land;

c)    Manipulating and coercing Mr. Postmus into falsely claiming that his vote in favor of the Settlement Agreement had been corruptly influenced by Colonies and Mr. Burum;

d)    Eliciting false statements during the investigation, and eventually perjurious testimony, from Defendants Gonzales, Aleman, and others, in particular regarding Mr. Burum's actions prior to the Colonies settlement;

e)    Threatening and attempting to coerce other witnesses, such as Matt Brown, into making false statements during the investigation and providing perjurious testimony; and

f)    Fabricating and falsifying evidence during the investigation.

120.   Mr. Burum's exercise of his constitutional rights, as set forth above, was a substantial and/or motivating factor in Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Mandel, and Schons's wrongful retaliatory conduct.

121.   Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Mandel, and Schons's actions against Mr. Burum would chill a person of ordinary firmness from continuing to exercise their constitutional rights;

122.   The harm to Mr. Burum from Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Mandel, and Schons's illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

123.   Defendants Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Mandel, and Schons's conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

## SECOND CLAIM

### Malicious Prosecution – 42 U.S.C. § 1983

### Against Defendants Cope, Randles, and Schreiber

124.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 123 of this Complaint as though fully set forth herein.

125.   As alleged herein, the investigation of Mr. Burum was not undertaken to obtain evidence of a crime, but instead to harass and retaliate against Colonies and Mr. Burum for exercising their First and Fifth Amendment rights and obtaining what Defendants perceived as a favorable settlement of the civil litigation.  When the District Attorney's Office learned of the settlement, it immediately began plotting to use its power and authority to retaliate against Colonies and Mr. Burum.

126.   And yet, even as late as 2017 when he was testifying under oath at trial, Defendant Randles explained "I don't know a lot about the facts" of the civil litigation.  Though he testified that he believed the Colonies settlement was egregious and outrageous, he had no factual basis for this belief.  He never read any of the documents underlying the civil litigation.  He read none of the judge's opinions.  He never read, much less understood, the appraisal that valued Colonies' land taken by the County at over $100 million.  He never bothered to interview many Colonies-related witnesses, instead relying almost solely on the biased complaints of County witnesses.

127.   Defendants Randles and Schreiber were the lead "investigators" in this retaliatory campaign against Colonies and Mr. Burum.  But rather than conducting a thorough and open-minded investigation, it was one-sided, biased, and conducted with the preordained goal of convicting Mr. Burum.  Defendant Cope likewise participated in and oversaw the unjust investigation, including bullying Mr. Postmus during investigative interviews into making false statements.  As alleged above, Defendants Randles and Schreiber also threatened and bullied witnesses, ignored exculpatory evidence that did not serve their purpose of retaliating against

47

Colonies and Mr. Burum, intentionally failed to obtain and/or preserve exculpatory evidence, fabricated evidence, and, in the case of Defendant Randles, even testified falsely under oath before the grand jury and trial jury.

128.    Moreover, and as alleged above, this improper investigation was carried out by the Public Integrity Unit, in which prosecutors participated in the investigation and the roles of prosecutors and investigators were comingled. Because of their comingled roles, and because prosecutors, including Defendant Cope, had participated in the biased investigation, prosecutors did not exercise independent judgment when prosecuting Mr. Burum.

129.    In the alternative, on information and belief, Defendants Randles and Schreiber knowingly withheld information from prosecutors in order to secure an indictment against Mr. Burum, including concealing the date on which their investigation began, concealing Defendant Aleman's misconduct, and withholding the extent of Mr. Postmus's drug use and hence his unreliability as a witness, and fabricating evidence, as alleged above.  Defendants Randles and Schreiber thus both withheld relevant information from prosecutors, and knowingly supplied false information to prosecutors.  As a result of their misconduct, prosecutors were unable to exercise independent judgment in prosecuting Mr. Burum.

130.    Defendants Randles and Schreiber also manipulated the investigation through their handling of Mr. Postmus, the prosecution's key cooperating witness. Knowing that Mr. Postmus was suffering from a long-time drug addiction, Defendants Randles and Schreiber used interrogation techniques designed to plant memories of events that never happened.  To encourage Mr. Postmus further, Defendants Randles and Schreiber never subjected Mr. Postmus to any drug monitoring or testing during the period of Mr. Postmus's cooperation, the better to keep Mr. Postmus pliable and cooperative.

131.    Defendants Randles, Schreiber and Cope, by their actions and conduct of the investigation as alleged above, maliciously caused Mr. Burum to be

48

prosecuted without probable cause, and they did so for the purpose of denying him his right to exercise his constitutional rights without government retaliation and to deny him the ability to exercise his constitutional rights going forward.

132.   The harm to Mr. Burum from Defendants Randles, Schreiber, and Cope's illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

133.   Defendants Randles, Schreiber, and Cope's conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of punitive damages as to each of them.

## THIRD CLAIM

### Fabrication of Evidence – 42 U.S.C. § 1983

### Against Defendants Randles and Schreiber

134.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 133 of this Complaint as though fully set forth herein.

135.   As alleged above, Defendants Randles and Schreiber fabricated evidence that was then used to criminally indict and prosecute Mr. Burum.  This included the false statements and testimony of Mr. Postmus, Defendant Aleman, and Defendant Randles himself.

136.   Additionally, as alleged above, Defendants Randles and Schreiber continued their investigation of Mr. Burum despite the fact that they knew that Mr. Burum was innocent, or were deliberately indifferent to Mr. Burum's innocence, and the results of the investigation were then used to criminally indict and prosecute Mr. Burum.

137.   Additionally, as alleged above, Defendants Randles and Schreiber used techniques that were so coercive and abusive that they knew, or were deliberately indifferent, that those techniques would yield false information that was then used to criminally indict and prosecute Mr. Burum.  In particular,

49

Defendants Randles and Schreiber coerced and manipulated Mr. Postmus into changing his testimony from a complete and unequivocal denial of any *quid pro quo* agreement with Mr. Burum, to instead pleading guilty to criminal conduct in connection with the Settlement Agreement and subsequent PAC contributions.

138.   The harm to Mr. Burum from Defendants Randles and Schreiber's illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

139.   Defendants Randles and Schreiber's conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

## FOURTH CLAIM

### *Monell* Claim – 42 U.S.C. § 1983

### Against Defendant County

140.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 139 of this Complaint as though fully set forth herein.

141.   Mr. Burum exercised his First and Fifth Amendment rights as set forth above.  The individual Defendants, acting under color of state law, then retaliated against Mr. Burum in the manner alleged herein for participation in what Defendants knew were First and Fifth Amendment protected activities.

142.   The County had in place official, widespread, and/or longstanding policies, practices, and/or customs that amounted to deliberate indifference to Mr. Burum's right to exercise his constitutional rights without government retaliation. These policies, practices, and/or customs were a moving force behind this illegal retaliatory conduct.  Specifically, the County maintained or permitted policies, practices, and/or customs that included, but was not limited to, the following:

a)      Permitting, condoning, and/or ratifying the District Attorney's office to engage its investigators and resources in politically-motivated

50

1   criminal investigations without regard for the existence of credible

2   evidence;

3   b)   Permitting, condoning, and/or ratifying County employees in the

4   District Attorney's Office to execute falsified search warrants and

5   engage in unwarranted criminal investigations in a manner intended to

6   punish, harass, and embarrass individuals and entities, such as Mr.

7   Burum and Colonies, as retaliation;

8   c)   Permitting, condoning, and/or ratifying collusive action between the

9   District Attorney's Office and other County employees for the purpose

10   of engaging in unwarranted criminal investigations in a manner

11   intended to punish, harass, and embarrass individuals and entities, such

12   as Mr. Burum and Colonies, as retaliation;

13   d)   Permitting, condoning, and/or ratifying the District Attorney's Office

14   to target constitutionally-protected First Amendment speech through

15   unwarranted criminal investigations for the purpose of chilling such

16   speech; and

17   e)   Permitting, condoning, and/or ratifying the Public Integrity Unit of the

18   District Attorney's Office to employ investigators dedicated to

19   working on Public Integrity Unit investigations, thereby removing

20   important checks and balances between investigators and prosecutors

21   and enabling the use of unwarranted criminal investigations as

22   retaliation.

23   143.   Additionally, Defendant Ramos as the District Attorney is an official

24   with final policymaking authority as it relates to the District Attorney's Office's

25   criminal investigations.  As such, his conduct alleged herein—including his

26   supervision of the Public Integrity Unit and his conscious, affirmative ratification of

27   the wrongful and retaliatory criminal investigation of Colonies and its partners,

28   including Mr. Burum—constituted an act of official government policy.

51

144.   As a legal and proximate result of the County's policies, practices, and/or customs alleged herein, and/or Defendant Ramos's conduct as an official with final policymaking authority, the County violated Mr. Burum's right to exercise his constitutional rights without government retaliation, causing him to suffer injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

145.   The County's conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages.

## FIFTH CLAIM

### Supervisorial Liability – 42 U.S.C. § 1983

### Against Defendants Ramos, Cope, Hackleman, Brown, Mandel, and Schons

146.   Plaintiff re-alleges and incorporates each allegation in Paragraphs 1 through 145 of this Complaint as though fully set forth herein.

147.   On information and belief, Defendant Ramos supervised Defendants Cope, Hackleman, Randles, and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Ramos knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Ramos's training, supervision, and/or control of Defendants Cope, Hackleman, Randles, and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

148.   On information and belief, Defendant Cope supervised Defendants Randles and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Cope knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation

52

of Mr. Burum's rights as alleged herein.  Moreover, Defendant Cope's training, supervision, and/or control of Defendants Randles and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

149.   On information and belief, Defendant Hackleman supervised Defendants Cope, Randles, and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Hackleman knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Hackleman's training, supervision, and/or control of Defendants Cope, Randles, and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

150.   On information and belief, Defendant Brown supervised Defendants Mandel, Schons, Randles, and Schreiber with regard to their conduct alleged herein. In this capacity, Defendant Brown knew or should have known of their illegal retaliatory conduct, yet he failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Brown's training, supervision, and/or control of Defendants Mandel, Schons, Randles, and Schreiber was a legal and proximate cause of their illegal retaliatory conduct and/or constituted deliberate indifference to the deprivations of Mr. Burum's rights.

151.   On information and belief, Defendant Mandel supervised Defendants Randles and Schreiber with regard to their conduct alleged herein.  In this capacity, Defendant Mandel knew or should have known of their illegal retaliatory conduct, yet she failed to take action to prevent that conduct and/or acquiesced in the deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant Mandel's training, supervision, and/or control of Defendants Randles and Schreiber

53

1    was a legal and proximate cause of their illegal retaliatory conduct and/or

2    constituted deliberate indifference to the deprivations of Mr. Burum's rights.

3        152.   On information and belief, Defendant Schons supervised Defendants

4    Randles and Schreiber with regard to their conduct alleged herein.  In this capacity,

5    Defendant Schons knew or should have known of their illegal retaliatory conduct,

6    yet he failed to take action to prevent that conduct and/or acquiesced in the

7    deprivation of Mr. Burum's rights as alleged herein.  Moreover, Defendant

8    Schons's training, supervision, and/or control of Defendants Randles and Schreiber

9    was a legal and proximate cause of their illegal retaliatory conduct and/or

10    constituted deliberate indifference to the deprivations of Mr. Burum's rights.

11        153.   The supervisory Defendants' conduct as described herein was so

12    closely related to the deprivation of Mr. Burum's rights as to be the moving force

13    that caused the ultimate injury.  Further, each of the supervisory Defendants was

14    acting under color of state law.

15        154.   As a legal and proximate result of Defendants Ramos, Cope,

16    Hackleman, Brown, Mandel, and Schons's supervisorial conduct, Mr. Burum's

17    right to exercise his constitutional rights without government retaliation was

18    violated, causing Mr. Burum to suffer injury and harm, including lost income, lost

19    business opportunities, loss of reputation, litigation expenses including attorneys'

20    fees, and other compensatory damages, in an amount to be proved at trial.

21        155.   Defendants Ramos, Cope, Hackleman, Brown, Mandel, and Schons's

22    supervisorial conduct was willful, wanton, malicious, and done with reckless

23    disregard for Mr. Burum's rights and therefore warrants the imposition of

24    exemplary and punitive damages.

25    ///

26    ///

27    ///

28    ///

# SIXTH CLAIM

## Conspiracy – 42 U.S.C. § 1983

### Against All Defendants

156.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 155 of this Complaint as though fully set forth herein.

157.   Defendants formed a combination of two or more persons acting in concert to commit the individual acts described above, the principal element of which was the agreement between the Defendants to illegally retaliate against Mr. Burum and deprive Mr. Burum of his constitutional rights.

158.   Defendants combined, colluded, conspired, and/or agreed to act in concert to wrongfully investigate Mr. Burum for the purpose of retaliating against him and Colonies for engaging in litigation against the County and District, for achieving the Settlement Agreement, and for exercising political influence that was threatening to the Defendants' political interests, all as alleged herein.

159.   Defendants performed overt acts in furtherance of the conspiracy as alleged herein.

160.   This conspiracy was the proximate cause of the illegal retaliation against Mr. Burum and the deprivation of Mr. Burum's constitutional rights, as alleged herein.

161.   As a direct result of Defendants' conspiracy, Mr. Burum suffered injury and harm, including lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

162.   Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

///

///

## SEVENTH CLAIM

### Negligence – Government Code § 815.2

### Against Defendants County, Ramos, Cope, Hackleman, Randles, Schreiber, Brown, Harris, Mandel, and Schons

163.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 162 of this Complaint as though fully set forth herein.

164.   Defendants owed a duty to Mr. Burum to act reasonably in the criminal investigating against him so as not to cause Mr. Burum undue harm, and a duty to adequately investigate all reasonable leads and evidence.  The County is liable for the acts of its employees under Government Code Section 815.2.

165.   Defendants breached their duty to Mr. Burum to act reasonably in his criminal investigation by unreasonably engaging in a biased and unfair investigation designed to retaliate against Mr. Burum and Colonies for their success in the civil litigation, subsequent PAC contributions, and public statements made about the County, District, and various County employees and officials.  Nor did Defendants adequately investigate all reasonable leads and evidence, as alleged above, including failing to adequately investigate the veracity of statements made by key prosecution witnesses such as Defendants Aleman and Gonzales.  These breaches were a substantial factor in causing Mr. Burum's unjustified prosecution and resulting harm.

166.   The harm to Mr. Burum from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

///

///

///

///

## **EIGHTH CLAIM**

**Intentional Infliction of Emotional Distress - Government Code § 815.2**

**Against Defendants County, Ramos, Cope, Hackleman, Randles, Schreiber,**

**Brown, Mandel, and Schons**

167.   Mr. Burum re-alleges and incorporates each allegation in Paragraphs 1 through 166 of this Complaint as though fully set forth herein.

168.   Defendants engaged in a biased and unfair investigation for the purpose of retaliating against Mr. Burum and Colonies for their success in the civil litigation, subsequent PAC contributions, and public statements made about the County, District, and various County employees and officials. Defendants failed to adequately investigate all reasonable leads and evidence, as alleged above, including failing to adequately investigate the veracity of statements made by key prosecution witnesses such as Defendants Aleman and Gonzales.  The County is liable for the acts of its employees under Government Code Section 815.2.

169.   Defendants' actions as alleged above were extreme and outrageous, including but not limited to falsifying evidence and eliciting false testimony, and knowingly pursuing an unwarranted investigation in order to subject Mr. Burum and others to six years of retaliatory criminal prosecution.

170.   Defendants' actions as alleged above were intended to cause Mr. Burum emotional distress or were taken with reckless disregard of the probability that Mr. Burum would suffer emotion distress.

171.   Defendants' actions as alleged above caused Mr. Burum severe humiliation, embarrassment, mental anguish, and emotional distress.

///

///

///

///

///

57

172.   The harm to Mr. Burum from Defendants' illegal actions includes injury to his person from emotional distress and physical manifestations therefrom, lost income and earning capacity, expenses from medical and psychological treatment, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be proved at trial.

173.   Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for Mr. Burum's rights and therefore warrants the imposition of exemplary and punitive damages as to each of them.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF demands judgment against Defendants for the following relief:

A.   Damages of no less than $50 million, but in an amount ultimately to be proven at trial, including, but not limited to:

   a.   Compensatory damages, including for injury to person, lost income, lost business opportunities, and loss of reputation; and

   b.   Punitive damages.

B.   An award of reasonable attorneys' fees, costs, and expenses to Plaintiff, pursuant to 42 U.S.C. § 1988, in an amount to be proven at trial;

C.   For costs of suit herein incurred;

D.   Pre-judgment interest;

E.   Such other and further relief as this Court shall find just and proper.

Dated:  July 25, 2018                    **LARSON O'BRIEN LLP**


                                        By:  /s/ Stephen G. Larson
                                            Stephen G. Larson
                                            Attorneys for Plaintiff
                                            JEFFREY S. BURUM

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.


Dated:  July 25, 2018                            **LARSON O'BRIEN LLP**


                                                 By:  /s/ Stephen G. Larson
                                                      Stephen G. Larson
                                                      Attorneys for Plaintiff
                                                      JEFFREY S. BURUM

59